**Thomas E. BAKER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 115, 2005.

Supreme Court of Delaware.

Submitted: June 21, 2006.
Decided: Aug. 28, 2006.

Ronald D. Phillips, Jr. and James D. Nutter (argued), Georgetown, Delaware, for appellant.

Kim Ayvazian, Department of Justice, Georgetown, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice.

The defendant-appellant, Thomas Baker, appeals from his convictions for Second Degree Rape and two counts of Unlawful Sexual Contact. During trial, Baker took the stand and testified in his own defense. He categorically denied all of the allegations of rape and sexual abuse that the complaining witness, his daughter, brought against him. On appeal, Baker argues, among other things, that while cross examining him, the prosecutor engaged in misconduct by insinuating through a question that Baker had some prior "familiarity with sex offenses." We have concluded that that misconduct about which Baker complains constitutes plain error. Accordingly, we reverse and remand.

### FACTS

At the time of his trial, the defendant, Thomas "Eddie" Baker was a sixty-three year old long distance truck driver. Baker had fifteen children by two different wives, and also had several grandchildren. Before June of 2004, Baker lived with his wife Irene Baker, several children, and several grandchildren at their home on Lonesome Road in Seaford. Ruth, the complaining witness in this case, is Baker's youngest daughter.

About ten or fifteen years ago, Baker developed diabetes, which caused him to suffer from boils, cysts, and swollen feet. At certain times, Baker's feet swelled so much that he could not tie his shoes. He also frequently had a sore back from driving. Baker's wife and several of his children periodically rubbed his feet, massaged his back, and popped his boils or cysts. This activity generally took place in his bedroom.

Ruth, who was sixteen at the time of the trial, testified that when she was thirteen, she began rubbing her father's feet, massaging his back, and "doing" or popping the bumps on his back and legs. She did this in the bedroom, which had only a curtain over the door. At some point during these massages, Ruth testified, Baker began sexually abusing her by touching and placing his hands and fingers inside her vagina. Ruth also testified that Baker rubbed her breasts inside her clothes. The abuse began about the time of Ruth's thirteenth birthday, which was in November, 2001. The contact always took place underneath the covers and occurred every week or week-and-a-half until Ruth's fourteenth birthday. During that year, Ruth testified, Baker inappropriately touched her in a similar fashion about forty times— every time that she went to give him a massage.

Ruth testified that the sexual abuse worsened as she grew older. When she was 14 or 15, Ruth took a trip with Baker on his work truck. During this trip, after they had driven for about a day, Baker inserted his penis into Ruth's vagina while they were both in the sleeper area of the truck. Ruth testified to yet another incident of rape when she went with Baker in

his personal truck to Parsonsburg, Maryland.[1]

The State proceeded at trial based on two instances of rape that allegedly occurred in Delaware. The first occurred during a school day in which Ruth stayed home at the residence in Seaford. During that day, Ruth testified, Baker again raped her. This incident occurred in Baker's bedroom, when Ruth was 14 or 15, in ninth grade, at the end of 2003 "before the year changed" to 2004, sometime around her school's "state testing," and "before Christmas." In an attempt to prove when the alleged rape occurred or to at least prove opportunity, the State called the investigating officer, Detective Chambers. Chambers compared Ruth's school absence record with Baker's work record to prove that Baker was home from work on the days Ruth was home from school during February 2004 and March 2004. Chambers also testified that state testing occurred in March 2004.

Ruth specifically described the alleged rape that occurred in the bedroom. According to her testimony on direct examination, Baker put on a condom and inserted his penis into her vagina. The rape ended after Baker "cum." After he did so, Baker took off the condom, balled it up in a paper towel, and threw it away.

The second and later of the two instances of rape that occurred in Delaware arose during a trip in which Ruth accompanied Baker to the Seaford Wal–Mart. Ruth testified that she accompanied Baker on an errand to Wal–Mart. Baker passed by Wal–Mart and drove his personal pickup truck to a back road nearby. He stopped the truck, stayed in his seat, put a condom on, and asked Ruth to take her pants off. Baker then climbed over the seat, placed Ruth's seat in the reclining position, and put his penis in Ruth's vagina. After the alleged rape, Baker moved back over to his seat, took his condom off, and threw it out the window.

Defense counsel attempted to illustrate on cross examination, and heavily emphasized during summation, that Ruth's testimony on direct examination about the two incidents of rape that allegedly occurred in Delaware was arguably inconsistent with statements she made earlier. On June 16, 2004, an employee of the Child Advocacy Center conducted a videotaped interview of Ruth, which the State played at trial.

---

1. The State only charged Baker with two counts of first degree rape based upon penile/vaginal penetration that occurred within Delaware. Nevertheless, Ruth testified to two incidents that occurred outside of Delaware. Defense counsel agreed to the admission of the testimony for tactical reasons (in her various statements to the authorities Ruth said that Baker raped her two, three, or four times, and defense counsel wanted to impeach Ruth by pointing out the inconsistencies). The first uncharged incident allegedly occurred in Baker's work truck when Ruth accompanied him on a trip. The second allegedly occurred in Baker's personal truck on the way to Parsonsburg, Maryland. In the jury instructions, the trial judge gave a purported "Getz–404(b)" instruction that follows:

During this trial there has been testimony that the defendant had alleged sexual contact with the complaining witness, occurring in another state, beyond the jurisdiction of the State of Delaware. Both the State and the Defense offer this evidence, but for different reasons. The State alleges the prior conduct is relevant as to the defendant's intent and motive as to the charged offenses. The Defense alleges the prior conduct is relevant as to your assessment of the complaining witness' credibility. I direct that you can only use this testimony for the above purposes and you cannot use it for any other purpose. You cannot and must not use any incident or sexual conduct occurring outside of the State of Delaware as to the allegation of sexual conduct alleged in Count 7—continuous sexual abuse of a child.

He also gave a similar instruction immediately after Ruth's testimony.

During the interview Ruth described the incident of alleged rape that occurred in the bedroom. She stated that Baker took his pants off, did *not* put a condom on, and stuck his penis in her vagina. Several minutes later Ruth stated that Baker ejaculated all over the place and that it was "all gooey and stuff."

Chambers also testified about certain statements Ruth made to him that defense counsel argued were inconsistent with her testimony on direct examination. During his investigation, Chambers took Ruth out to the scene of the alleged rape on the back roads behind Wal–Mart. Chambers testified that during this trip Ruth told him that Baker pulled off on a stony section of the road, "pulled out a condom, placed it on his penis, *exited the driver's side, walked around the vehicle, had [Ruth] step out of the passenger seat,* at which time he sat in the passenger seat and had her get on top of him after removing her pants." [2]

After the first alleged rape in Baker's bedroom and the second alleged rape in Baker's personal truck, Baker continued to touch Ruth inappropriately in the bedroom, and also when Ruth accompanied him on errands. These incidents occurred while Ruth was in ninth grade and after the alleged rape in the bedroom, which, from her earlier testimony, would indicate a time period of "before Christmas" in 2003 until June 12, 2004 at the latest.

On the evening of June 12, 2004, while he was lying in his bed, Baker requested that Ruth massage his back and feet. Ruth refused and told Baker that she did not feel well. Baker then asked Ruth to get under the covers with him, which she interpreted to mean that he was going to "mess" with her. After refusing to massage Baker, Ruth called her sister Patty and told her "everything that happened" and that she planned to report the sexual abuse to the police. After the phone call to Patty, Ruth called Jessica Collins, her brother's former girlfriend. Ruth told Collins that that Baker was sexually abusing her and that she wanted to go to the police. Collins came to the Seaford residence, picked up Ruth, and took her back to where Collins then lived. Officer Vonthenen of the Blades police department met them there. Ruth discussed the history of abuse with Vonthenen, who testified about Ruth's statements.

On direct examination Ruth also testified that she told her mother, her sister, Patty Willin, and two of her friends, Jessica David and Ashley Hill, about the sexual abuse at various times before she went to the police. During Ruth's testimony, the State also introduced Ruth's journal as an exhibit. In the journal, Ruth described her father "messing" with her and having sex with her.

After Ruth testified, the State called Irene Baker, who testified that her daughter, Patty Willin, called about six months before June 13, 2004 and informed her that Ruth claimed that Baker was sexually abusing her. Irene thought that Ruth might have complained to Patty about sexual abuse because Baker had grounded her. Irene also testified that after coming back from a trip with Baker on his work truck, Ruth told Irene that she was no

---

**2.** Interestingly, during her direct examination Ruth very briefly described the alleged rape that occurred on the back roads near Wal–Mart in a similar fashion. Ruth testified that Baker "got in my side, my door, and he stuck his penis inside of me only once." *This statement is consistent with Chambers' testimony* about what Ruth related to him when they visited the scene of the alleged rape. The statement does, however, appear to be inconsistent with what Ruth later testified on direct examination about Baker climbing over to the passenger seat.

longer going on similar trips, but did not explain why. On cross examination, Irene, who is *Ruth's mother*, testified that Ruth had "been known to lie to get her way in a few incidents. So I can't say she's being honest all the time."

Patty Willin testified that perhaps three to six months before June 12, 2004, Ruth called her and related the story of sexual abuse. After Willin testified, the State called Jessica Collins, who explained the events that occurred on June 12, 2004. On that evening, Ruth called Collins and asked Collins to come pick her up because Baker was sexually abusing her. In response to a question from the prosecutor, Collins testified that Ruth did not have a good reputation for truthfulness in the community. On cross examination, Collins related her own opinion of Ruth's truthfulness: "She lies very bad."

The State called several other witnesses including Ashley Hill and Jessica David, two of Ruth's friends, who testified that Ruth told them about Baker's sexual abuse sometime before June 12, 2004. Hill testified that Ruth related the story about sexual abuse and rape between the middle of May and June 2004. David testified that Ruth related the story about the inappropriate touching, but not rape, within a week of February 3, 2004.

The defense called several of Baker's children to testify on his behalf: Lina Bramble, Mary Polite, Charles Baker, Grace Beachamp, and Cindy Beach. Those children testified that, in their opinion, Ruth was untruthful. Some of the female children testified that they had accompanied Baker on long truck trips and had given him massages and rubbed his feet without incident. The defense also called Nicole Dickenson who testified that she had a conversation with Ruth about Ruth's allegations against Baker. According to Dickenson, Ruth said that she was

going to get back at Baker because Baker would not let Ruth do what she wanted to do. Dickenson also testified that Ruth told her that Baker did not do the things that Ruth alleged. Dickenson later testified that she had spoken to Jessica David, who said that she was trying to reach Ruth to ask Ruth what Ruth wanted her to say at trial. Moreover, Dickenson echoed the sentiment that Ruth was untruthful. Standing alone, Dickenson's testimony seemed very damaging to the State's case. The prosecutor did, however, effectively cross examine Dickenson about her motives for helping Baker and her delay in coming forward with the information that Ruth had made up the allegations of sexual abuse and rape.

Baker took the stand and testified in his own defense. He categorically denied all of the allegations of sexual abuse and rape against him. The main focus of Baker's testimony was that he was unable to get an erection. Five to seven years ago, Baker testified, he had a cyst between his legs lanced. After that point, he was unable to get a full erection, but could get "not very much of a partial" erection. Because of the erectile dysfunction, Baker was unable to have sexual intercourse with his wife. He reported this problem to his doctor about four or five years before the trial. The doctor prescribed Viagra, but after trying the Viagra three times with his wife, Baker stopped using it because, even with the Viagra, he could not have an erection.

On cross examination, Baker testified that on the second of the three times he tried the Viagra, around 2000 or 2001, he was able to get three-quarters of an erection and ejaculate outside of his wife, but that he stopped using the Viagra after the three times because he could not get a full erection. Baker also admitted that the night Ruth went to the police, he asked

her to come into his room to massage his back under the covers because he was "chilly," but that she "haul-tailed it" out of the bedroom. Irene Baker corroborated Baker's testimony about his inability to achieve an erection.

Baker also testified that sometime in the spring of 2004, he sent Ruth to the doctor with her mother to see if Ruth was still a virgin. He was concerned because Ruth had run away and was not in her bedroom when he came home one night.

The case against Baker went to the jury on seven counts: (1) First Degree Rape occurring between May 1, 2004 and June 5, 2004 in Baker's personal truck; (2) First Degree Rape occurring between February 4, 2004 and March 30, 2004 in Baker's bedroom; (3) Second Degree Rape occurring between November 11, 2001 and November 10, 2002 by means of digital penetration; (4) Second Degree Unlawful Sexual Contact, occurring between November 11, 2001 and November 10, 2002 by means of rubbing the victim's vagina and breasts; (5) Second Degree Rape occurring between November 11, 2002 and June 2, 2004 by means of digital penetration; (6) Second Degree Unlawful Sexual Contact occurring between November 11, 2002 and June 2, 2004 by means of rubbing the victim's vagina and breasts; and (7) Continuous Sexual Abuse of a Child occurring between November 10, 2001 and November 10, 2002.

During their deliberations, the jury sent a note to the trial judge indicating that they could not reach a unanimous vote on Counts 2, 3, 5 and 7, but could agree on Counts 4, 6, and 1. While the trial judge considered an *Allen* charge, however, the jury informed the bailiff that they were near a verdict. Shortly thereafter, the jury returned verdicts of "not guilty" on Counts 1, 2, 3, and 7, and "guilty" verdicts on Counts 4, 5, and 6.

## DISCUSSION

On appeal, Baker claims that the prosecutor engaged in misconduct that unfairly affected the outcome of the trial by impermissibly "fishing" or asking questions for which he did not, in good faith, have a factual predicate. Baker cites two incidents of alleged "fishing," the first of which occurred during direct examination of Patty Willin, one of Ruth's sisters. Because we have determined that the second instance of "fishing" was so unfairly prejudicial that it constitutes reversible error in and of itself, we need not address the first instance of "fishing."

The second instance of alleged misconduct occurred when the prosecutor cross examined Baker. To understand fully the nature of the allegedly improper cross, it is necessary to quote the relevant portion of Baker's testimony on direct:

Q (Defense counsel): Was there an occasion where you sent Ruthy to the doctor?

A (Baker): Yes, there was.

Q: When was that?

A: I don't remember the date. But it was, I'd say, in the spring of 2004 or right close to spring.

Q: What did you send her to the doctor for?

A: To see if she's ever had sex or anything, see if she's still a virgin.

Q: Why did you do that?

A: Because she had run away or wasn't in her bedroom when I come home.

Q: Who did you send her to the doctor with?

A: Her mother.

Q: What instructions did you give her mother?

A: For her to have her checked to see if she had been sexually active, or whatever.

Q: Why was that a concern of yours?

A: Well, she wasn't home. She run away. They were having a party next door. I sent my son over there three or four times, and he come back and he kept telling me, Dad, she's not there.... And I guess in five minutes she walked in through the back door and I said, where have you been, Ruthy. She said, well, I've been asleep out in the blue car. I got a '65 Chevelle sitting out back. It was a little chilly, not too cold. But, you know, at least she had a jacket on.

And she said, I just woke up there. Of course, by her eyes she looked like she just woke up. So I took her—told her mother to send her on to the doctor, anyway.

Q: Did that story that she gave you make sense to you?

A: Well, I took her word for it.

Q: You still felt the need to send her to the doctor?

A: Yes, sir.

During cross examination, the following exchange occurred:

Q (Prosecutor): Now, this time that you say you took Ruthy to the hospital, it was to see whether or not she was still a virgin?

A (Baker): I did not take her to the hospital.

Q: But you directed someone?

A: I directed my wife to.

Q: And you have some familiarity with sex offenses? There are other members that you know, other friends, other people that you know have been accused of sex offenses?

At this point, defense counsel asked the trial judge for permission to approach the bench. After approaching, defense counsel appeared to object on the basis that this question was irrelevant and beyond the scope of direct.[3] The prosecutor (as we construe his position from the record) argued that his question was relevant because if Baker were aware of a friend or family member who had been investigated for sexual abuse, he might be aware of the medical investigative techniques that apply to rape cases. In other words, the prosecutor argued, that if Baker had this type of knowledge, he might have sent Ruth to the hospital to determine whether she was still a virgin so that if it turned out that she was not, he could have intercourse with her without the physical evidence of the fact that his daughter was no longer a virgin being attributable to him.

The trial judge and the prosecutor explored this position in detail on the basis of the question's "relevance." The trial judge ultimately concluded that the prosecutor's theory was too "clever," confused him, and therefore would likely confuse the jury. The trial judge then concluded that whatever relevance the response might have was substantially outweighed by the possibility of jury confusion under D.R.E. 403. The following exchange then occurred:

THE COURT: ... do you even know what his answer is going to be, or were you just kind of like—

Prosecutor: *How would I know?*

THE COURT: So long. I understand that. I did not know if in the investi-

---

**3.** "I'm not exactly sure where he's going or what the relevance of other people being accused is. It didn't seem to have anything to do with my direct examination. I can't, for the life of me, see where he's going with it."

gation something came out when you talked to the police.

Prosecutor: I have no statement.

THE COURT: Let's not go down that row to hoe then.

Immediately thereafter, defense counsel and the prosecutor returned to their tables and the prosecutor continued his cross examination. The trial judge did not give a curative instruction, strike the question, sustain the objection in the jury's presence, or in any way tell the jury that the prosecutor's question(s) may have suggested that the prosecutor had knowledge that Baker had "some familiarity with sex offenses" when in fact the prosecutor admitted that he had no good faith basis in fact to phrase the question as he did.

Our analysis of whether alleged prosecutorial misconduct warrants a reversal of a defendant's conviction begins with whether the issue was fairly presented below.[4] Over the years, just as we have continuously admonished prosecutors to refrain from engaging in misconduct at trial, we have likewise admonished defense counsel to raise timely objections to that misconduct.[5] Timely objections to prosecutorial misconduct give the trial prosecutor an opportunity to respond to the allegation of misconduct in the first instance and, more importantly, give the trial judge the opportunity to consider whether misconduct in fact occurred and if so what, if anything, should be done to remedy it. One factor of the *Hughes*[6] test looks to the steps the trial judge took to mitigate the effect of prosecutorial misconduct. Without a timely objection that focuses the trial judge's attention on the specific alleged misconduct, the trial judge rarely can be expected to take steps that will mitigate its effects.

■ Consequently, our standards for reviewing prosecutorial misconduct are slightly different depending on whether the issue was fairly presented below. If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for "harmless error." If defense counsel failed to do so and the trial judge did not intervene *sua sponte*, we review only for plain error.[7] We take this opportunity to restate our case law as it applies to both the harmless and plain error standards of review for prosecutorial misconduct.

### *Harmless Error*

■ The first step in the harmless error analysis involves a *de novo* review of the record to determine whether misconduct actually occurred.[8] If we determine that no misconduct occurred, our analysis ends there. If, however, we determine that the trial prosecutor did engage in misconduct, we move to the second step in the analysis, because not every instance of prosecutorial misconduct requires rever-

---

4. Sup.Ct. R. 8, *See Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

5. *See Trump v. State*, 753 A.2d 963, 969–970 (Del.2000), 753 A.2d at 976–970 (citing *Mason v. State*, 658 A.2d 994, 999 (Del.1995)); *Morris v. State*, 795 A.2d 653, 661, n. 22 (Del.2002); *Mathis v. State*, 2006 WL 2434741, *5, n. 29. (Del.2006).

6. *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981); *See Supra* pg. 17.

7. *See e.g., Kurzmann v. State*, 903 A.2d 702, 2006 Del. LEXIS 390, *11 (Del.2006).

8. *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (citing *Hunter v. State*, 815 A.2d 730 (Del.2002)); *Price v. State*, 858 A.2d 930, 939 (Del.2004); *Flonnory v. State*, 893 A.2d 507, 538 (Del.2006).

sal.[9] Only improper comments or conduct that prejudicially affect the defendant's substantial rights warrant a reversal of his conviction.[10] To determine whether prosecutorial misconduct prejudicially affects a defendant's substantial rights, we apply the three factors of the *Hughes* test, which are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.[11] The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact sensitive manner. If after applying the *Hughes* test we conclude that the misconduct warrants reversal, we do not reach or apply what has been referred to as the *Hunter* test.[12]

 Although several of our recent cases may be read to suggest that the *Hunter* test is simply the fourth factor in a single unified *Hughes–Hunter* four-factor test,[13] that is not the case.[14] The *Hunter*

test only applies in an instance where the application of the *Hughes* test does not lead to a reversal. Where the prosecutorial misconduct "fails" the *Hughes* test (e.g., where the case is not close, the issue affected by the prosecutorial misconduct is not central, *or* the trial judge gives an adequate curative instruction), and otherwise would not warrant reversal, we examine *Hunter*—the third step in the harmless error analysis for prosecutorial misconduct—considering whether the prosecutor's statements or misconduct are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.[15] Under the *Hunter* test, we *can* reverse, but need not do so, notwithstanding that the prosecutorial misconduct would not warrant reversal under the *Hughes* test.[16] Where the misconduct does not warrant reversal under the *Hunter* test, we have other options available to address prosecutorial misconduct like referring the case to the Attorney General for internal discipline[17] or to the Office of Disciplinary Counsel.

9. *Daniels*, 859 A.2d at 1011 (*citing and parenthetically quoting United States v. Sherman*, 171 F.2d 619, 625 (2d Cir.1948)) ("No prosecution is tried with flawless perfection; if every slip is to result in reversal, we shall never succeed in enforcing the criminal law at all.")

10. *Daniels*, 859 A.2d at 1011 (*citing Sexton v. State*, 397 A.2d 540, 544 (Del.1979); *Edwards v. State*, 320 A.2d 701 (Del.1974); Del.Super. Ct.Crim. R. 52(a) ("Any error ... which does not affect substantial rights shall be disregarded.")); *Derose v. State*, 840 A.2d 615, 619 (Del.2003); *Bugra v. State*, 818 A.2d 964, 967 (Del.2003); *Caldwell v. State*, 770 A.2d 522, 527 (Del.2001).

11. *Hughes*, 437 A.2d at 571 quoting *Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980); *Flonnory*, 893 A.2d at 538.

12. *Hunter*, 815 A.2d at 732.

13. *See e.g.*, *Briscoe v. State*, 2006 WL 2190581, 2006 Del. LEXIS 412, *12, n. 8

(Del.2006) (Order); *Kurzmann*, 903 A.2d 702, 2006 Del. LEXIS 390, *11; *Smith v. State*, 902 A.2d 1119, 2006 Del. LEXIS 218,*30, *43–44 (Del.2006); *Flonnory*, 893 A.2d at 538; *Thompson v. State*, 886 A.2d 1279, 2005 Del. LEXIS 423, *5–6 (Del.2005) (Order);

14. By this statement we do not intend to imply that these earlier cases were incorrectly decided, for they were not. The articulation of the standard of review in those cases, however, was arguably slightly confusing. The application of the prosecutorial misconduct standards in those cases would be the same, as would the result under this restatement of the law governing prosecutorial misconduct.

15. *Hunter*, 815 A.2d at 732.

16. *See Id.* at 737–738;

17. *See Price*, 858 A.2d at 941 ("Departure from these ethical and professional obligations should be remedied other than by

### Plain Error

▮▮▮ Where defense counsel fails to raise a timely and pertinent objection to alleged prosecutorial misconduct at trial and the trial judge does not intervene *sua sponte*, we review only for plain error.[18] The first step in the plain error review of prosecutorial misconduct mirrors that in the review for harmless error: we examine the record *de novo* to determine whether prosecutorial misconduct occurred. If we determine that no misconduct occurred, our analysis ends. If, however, the trial prosecutor did engage in misconduct we move to the second step in the plain error analysis by applying the familiar *Wainwright* standard. Under that standard,

the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the *trial* process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[19]

▮▮▮ If we determine that plain error occurred under the *Wainwright* standard, we will reverse without reaching the third step of the analysis. As with the harmless

error analysis, if we conclude that the misconduct would not warrant reversal under the *Wainwright* standard, we proceed to apply *Hunter* as the third analytical step and consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the *judicial* process. Again, under the *Hunter* analysis, we *can* reverse, but need not do so, even if the prosecutorial misconduct would not warrant reversal under the *Wainwright* standard. Other options are available: we can still remedy egregious prosecutorial misconduct by referring the case to the Attorney General or to the Office of Disciplinary Counsel.

Some of our recent cases appear to have created an unnecessary gloss on the plain error standard of review for prosecutorial misconduct, at least for specific types of misconduct.[20] These cases appear to suggest another or additional standard by which we determine whether prosecutorial misconduct is plain error. A fair reading of these cases would be that prosecutorial misconduct or improper comments will only lead to reversal under the plain error standard where credibility is a central issue in a close case and the prosecutorial misconduct is so clear, and defense counsel's failure to object so inexcusable, that a

---

reversing convictions as a means to punish a blundering ... prosecutor. Where (as here) we can fairly conclude the unfair prejudice caused by such a prosecutor did not adversely affect the outcome of a trial and did not reflect a pattern of conduct that compromises the integrity of the judicial process, we must find other ways to address the prosecutor's misconduct.") (internal quotations and citations omitted).

18. *Kurzmann*, 903 A.2d 702, 2006 Del. LEXIS 390 at *11; *Morris*, 795 A.2d at 657; *Robertson v. State*, 596 A.2d 1345, 1356 (Del.1991); *Mason*, 658 A.2d at 996.

19. *Wainwright*, 504 A.2d at 1100. (emphasis added and citations omitted).

20. *See e.g., Mathis*, 2006 WL 2434741, *3; *Drummond v. State*, 826 A.2d 298, 2003 Del. LEXIS 509, *7–8 (Del.2003) (Order); *Derose*, 840 A.2d at 619; *Swan*, 820 A.2d at 356 (Del.2003); *Williams v. State*, 803 A.2d 927, 928 (Del.2002); *Morris* 795 A.2d at 660; *Churchill v. State*, 812 A.2d 224 (Del.2002) (Order); *Cousins v. State*, 793 A.2d 1249 (Del.2001)(Order); *Bruce v. State*, 781 A.2d 544, 554 (Del.2001); *Warren v. State*, 774 A.2d 246, 256–257 (Del.2001); *Caldwell*, 770 A.2d at 527; *Clayton v. State*, 765 A.2d 940, 944 (Del.2001); *Trump* 753 A.2d at 965.

trial judge, in the interest of fundamental fairness, has no reasonable alternative other than to intervene *sua sponte* and declare a mistrial or issue a curative instruction. We regard this gloss as an unnecessary overlay on the familiar *Wainwright* plain error standard. Essentially, the "*sua sponte* intervention" standard and the *Wainwright* standard are the same and serve the same purpose. Both help us determine whether instances of misconduct to which defense counsel did not object, and which the trial judge did not address *sua sponte*, are nonetheless so facially egregious that they require reversal of the defendant's convictions.[21] In other words, unremedied prosecutorial misconduct that would be plain error under the *Wainwright* standard would also be plain error under the *sua sponte* intervention standard, and *vice versa*. For the sake of maintaining clarity in our law, we think it prudent to abandon the *sua sponte* intervention standard entirely in favor of the *Wainwright* standard. That will lead to doctrinal consistency, promote the clarity of our case law, and generally bring our plain error review of prosecutorial misconduct claims squarely within that same standard of plain error review that we employ in other areas of the criminal law.

 Although we abandon the *sua sponte* intervention standard today as an unnecessary overlay on the *Wainwright* standard, we reemphasize that trial judges have a continuing duty to intervene *sua sponte*, even in the absence of defense counsel's objection, when a trial prosecutor

steps out of bounds. The *sua sponte* intervention standard served the purpose of reminding trial judges of their obligation to actively intervene in criminal trials, in the interest of fundamental fairness, when defense counsel fails to object properly to prosecutorial misconduct. Although we abandon the *sua sponte* intervention standard, we disclaim any intent to discourage trial judges from actively intervening to remedy unfairly prejudicial conduct.[22]

*Application*

 It is clear that where defense counsel fails to raise *any* objection at trial to alleged prosecutorial misconduct and the trial judge fails to intervene *sua sponte*, we review claims of prosecutorial misconduct on appeal for plain error. Similarly, where defense counsel raises a pertinent, specific, and timely objection on the grounds of prosecutorial misconduct or the trial judge intervenes *sua sponte* and determines whether prosecutorial misconduct occurred, we will review for harmless error. This case presents a more perplexing question because it falls somewhere between these two alternatives. Here, defense counsel at least raised a misfocused objection on relevance grounds, that arguably triggered an analysis of whether the prosecutor's question caused unfair prejudice under D.R.E. 403. Once the trial judge employed a D.R.E 403 analysis based on jury confusion, he was merely steps away from the real issue which is whether the prosecutor's compound question unfairly prejudiced Baker. Had the trial judge's analysis not stopped with jury

21. *See e.g., Bruce v. State,* 781 A.2d at 554, n. 40 (citing *Trump,* 753 A.2d at 964–65, *Robertson,* 596 A.2d at 1356); *See also Trump,* 753 A.2d at 966, n. 4 (citing *Mason,* 658 A.2d at 996; *Robertson,* 596 A.2d at 1356).

22. This framework assumes a single instance of misconduct. When the prosecutor engages

in more than one instance of misconduct, "our analysis includes a review of both the statements' [or misconducts'] individual and cumulative effect." *Swan v. State,* 820 A.2d 342, 356 (Del.2003) (citing *Mason,* 658 A.2d at 999; *Michael v. State,* 529 A.2d 752, 765 (Del.1987)); *See also Derose,* 840 A.2d at 623.

confusion, there is no doubt that he would have considered the *Getz* implications of the first part of the question. The State contends that because the objection was misfocused, because defense counsel did not specifically argue that the prosecutor did not have a good faith factual predicate for his question, and (presumably) because the trial judge did not *sua sponte* consider this issue, we may review only for plain error. But, we need not quibble over whether defense counsel's misfocused objection triggered harmless or plain error review. We have concluded that the prosecutorial misconduct warrants reversal under the plain error standard of review. It therefore would *ipso facto* warrant reversal under the harmless error standard as well.

For over twenty-five years, we have admonished prosecutors to follow the ABA standards governing the prosecution function.[23] One such standard is 3–5.7, which governs the prosecutor's examination of witnesses and provides that "[a] prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking."[24] That standard of conduct is particularly important given the prosecutor's heightened obligation as a servant of the law and the public.[25] Prosecutors are "officers of the court and . . . representatives of the State" and, therefore, have a "special duty to ensure that any convictions are based on the evidence presented at trial. . . ."[26] Members of the jury are likely to assume that prosecutors will satisfy their heightened obligations of impartiality, and thus may give undue weight to questions that prosecutors ask that imply facts not in evidence. As the Maryland Court of Appeals has eloquently stated:

> Questions alone can impeach. Apart from their mere wording, through voice inflections and other mannerisms of the examiner—things that cannot be discerned from the printed record—they can insinuate; they can suggest; they can accuse; they can create an aura in the courtroom that the trial judge can sense but about which we could only speculate. The most persistent denials, even from articulate adult witnesses, may not suffice to overcome the suspicion they can engender. . . .[27]

Accordingly, "it is a well-established principle that the prosecutor has a special obligation to avoid improper suggestions, insinuations, and, especially, assertions of personal knowledge."[28] Moreover, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defen-

**23.** *See Hunter*, 815 A.2d at 735; *Williams*, 803 A.2d at 928, *Brokenbrough v. State*, 522 A.2d 851, 858 (Del.1987).

**24.** *ABA Criminal Justice Standards, Prosecution Function*, Standard 3–5.7(d), available at http://www.abanet.org/crimjust/standards/pfunc_toc.html; *See also State v. Long*, 1992 WL 207258, 1992 Del.Super. LEXIS 338, *12, n. 1 (Del.Super.1992) (Steele, J) (citing the former version of Standard 3–5.7(d)) *aff'd by* 628 A.2d 84, 1993 Del. LEXIS 250 (Del.1993).

**25.** *See Miller v. State*, 893 A.2d 937, 952 (Del. 2006); *Bennett v. State*, 53 Del. 36, 43, 164 A.2d 442 (Del.1960); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935);

**26.** *Clayton*, 765 A.2d at 943.

**27.** *Elmer v. State*, 353 Md. 1, 724 A.2d 625, 632 (1999) (quoting *Craig v. State*, 76 Md.App. 250, 544 A.2d 784, 805 (1988), *rev'd on other grounds*, 316 Md. 551, 560 A.2d 1120 (1989), *jdgmt vacated on other grounds*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)).

**28.** *Trump*, 753 A.2d at 968 (citations and internal quotations omitted).

dant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." [29]

In this case, the underlying improper question was, in fact, two questions:

(1) And you have some familiarity with sex offenses?

(2) There are other members that you know, other friends, other people that you know have been accused of sex offenses?

Although the first and second questions are not connected by an "and," the question(s) are very close to being compound—indeed, one might say, they are the functional equivalent of a compound question. The prosecutor phrased the first question so as to imply clearly that he had a factual basis to conclude that the defendant had some involvement with sex offenses before he committed the ones for which he was on trial—enough involvement, at least, to make him "familiar with sex offenses." From the prosecutor's question the jury could have drawn impermissible inferences that Baker himself ("you") had been engaged in, investigated, arrested, charged, or convicted of earlier sex offenses and then made the impermissible conduct-from-character inference against which this Court remains ever vigilant.[30]

At trial, defense counsel, the prosecutor, and the trial judge focused on only the second implication of the prosecutor's convoluted double question. The prosecutor's second question arguably clarified what he intended by the first, yet created a different possible implication (the one that the trial judge and the prosecutor explored during their sidebar conversation)—wheth-

er Baker sent Ruth to the hospital for an examination to establish whether she was still a virgin, to determine whether he could have sex with her without leaving behind any physical evidence, i.e., her loss of virginity. In our judgment, although that second possible implication is present, it is not clear from the prosecutor's second question. The jury heard only the prosecutor's questions and heard defense counsel's request to approach the bench. The jury was not privy to the sidebar conversation in which the prosecutor explained his "clever" and "confusing" theory to the trial judge. Even the trial judge did not understand the thrust of the prosecutor's questioning until after a relatively lengthy discussion with the prosecutor. The trial judge, however, neither gave the jury a curative or cautionary instruction, nor did he tell the jury that he had sustained a defense objection. Because the trial judge did not give a curative instruction or instruct the jury to disregard the question, and because the prosecutor immediately resumed his cross examination after the sidebar discussion, the question lingered and Baker never had the opportunity to counter or deny the implications of the first question.

We are satisfied that, on the facts of this case, the prosecutor's question, whether simply "inartfully worded" or consciously intended to insinuate prior incidents of sexual abuse, constituted clearly egregious misconduct.[31] The question implied the existence of a predicate fact—that Baker had "some familiarity with sex offenses"—from which the jury, in the absence of judicial intervention, could have drawn ex-

**29.** DEL. LAWYERS' RULES OF PROF'L CONDUCT R. 3.8, com. [1].

**30.** *See e.g., Getz v. State,* 538 A.2d 726 (Del. 1988); *Deshields v. State,* 706 A.2d 502 (Del. 1998).

**31.** *See Weddington v. State,* 545 A.2d 607, 610 (Del.1988) (prosecutor impermissibly injected race into the trial by asking the now infamous "loose white women" question when he did not have a factual basis for doing so).

tremely damaging character inferences. After the trial judge asked whether the prosecutor knew what Baker's answer to the question would be, the prosecutor essentially admitted that he did not have a good faith basis for asking the question: "[h]ow would I know?"[32] The second question did not sufficiently clarify the first question and did not, in any way, draw the focus away from the improper implication of the first question. Where even the trial judge had to struggle to apprehend the prosecutor's clever and confusing theory, *a fortiori*, the jury, having heard only the questions that prefaced the exposition of that theory, could not have distinguished between the two possible implications embedded in the first and second parts of the question. By asking the questions at issue here, the prosecutor failed to satisfy his special obligation to avoid improper suggestions, insinuations, and assertions of personal knowledge.

 Having determined that the prosecutor's question was misconduct, we must next determine whether the failure to remedy it constitutes plain error. Again, to constitute plain error the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects that are apparent on the face of the record, are basic, serious, and fundamental in their character, and clearly deprive an accused of a substantial right, or clearly show manifest injustice.[33] We are satisfied that the prosecutor's question was a material defect so clearly prejudicial to Baker's substantial rights that asking it constituted a manifest

injustice. The improper question is apparent on the face of the record, basic, serious, and fundamental. Fewer things are more damaging to a defendant's case and credibility, particularly in a he-said, she-said, rape and child sexual abuse case, than a lingering, unfounded question that raises *Getz* issues and permits the jury to draw an impermissible conduct-from-character inference that is entirely unjustified. This was not a case where there was overwhelming evidence of the defendant's guilt. Rather, it was a close case, without any physical evidence, that turned on the jury's credibility determinations. Many defense witnesses testified that the complaining witness was untruthful and her story seemed inconsistent at points. Moreover, the jury initially sent a note to the trial judge indicating that they could not reach unanimous verdicts on several of the charges, and ultimately acquitted the defendant of four of the seven charges against him. To allow the defendant's convictions to stand given these circumstances would amount to manifest injustice. Accordingly, we conclude that plain error exists and that we must reverse.

We find the State's argument against this result unpersuasive. The State argues, first, that the trial judge feared only that the jury would be confused by the prosecutor's line of questioning and that he "apparently saw no other opportunity for unfair prejudice in the question at the time it was asked." Citing *Thompson v. State*,[34] the State suggests that the trial judge is in the best position to observe and determine the effect and possible prejudice of prosecutorial questioning. Moreover, the State

---

32. This response, on a cold record, appears flippant and cavalier given the serious potential for unfair prejudice implicit in the confusing double questions. The trial judge's equally curt and clipped reply—"So long"—underscores that inference.

33. *Wainwright*, 504 A.2d at 1100.

34. 399 A.2d 194, 199 (Del.1979)

argues, even though the trial judge did not give a curative instruction or strike the offending question immediately after the sidebar, his general instruction to the jury before they began their deliberations mitigated any possible prejudice. The trial judge instructed the jury:

> As to any questions *to which an objection was sustained,* you must not speculate upon what the answer might have been. It's the answer to a question which is evidence and not the question itself. If the witness does not know the answer, then there is no evidentiary value to the question. (emphasis added).

Because we generally presume that the jury follows the trial judge's instructions,[35] the State argues, this general instruction "more than adequately informed the jury as to the proper consideration of the evidence." The State's argument proves too much.

Any time a trial prosecutor asks a question for which he does not have a good faith factual predicate, we agree that the trial judge will generally be in the best position to assess the potential prejudice stemming from that question. Moreover, in most, if not all, cases, a general instruction, like the one given in this case, might suffice. Finally, we do customarily presume that the jury followed the trial judge's instruction. Although the State correctly states the law, at some point our judgment about the prejudicial nature of the improper conduct will overcome these presumptions.[36] Taken to the extreme, the general principles relied upon by the State would likely preclude all appellate review of any improper questioning, no matter how egregious—even where the error is apparent on the face of the record, is basic, serious, fundamental in its character, clearly deprives the defendant of a substantial right, or clearly demonstrates a manifest injustice.[37]

If the trial judge had given a curative instruction immediately after the prosecutor's question, had stricken the question, or had sustained the defense's objection at the bench in the jury's presence, the State's argument might have merit.[38] But that did not happen here. Accordingly, we are not convinced that the State's argument precludes a finding of plain error.

Nor are we convinced that *Bromwell v. State*[39] is persuasive, as the State suggests. In *Bromwell,* the defendant was convicted of robbery. During the trial, defense counsel asked the defendant what he, a Maryland resident, was doing in Sussex County on the day of his arrest.[40] The defendant answered that he "came over here for a job employment and had my parole transferred over here." [41] Defense counsel did not interrupt the defendant's testimony to request that the trial judge remedy the defendant's mention of parole. On cross examination, the prosecutor asked the defendant "you noted on direct examination that you wanted to get your parole transferred to the State of Delaware. If you had been paroled, have you

35. *Price v. State,* 858 A.2d 930, 940 (Del. 2004); *Shelton v. State,* 744 A.2d 465, 483 (Del.2000) (citations omitted).

36. *See Weddington,* 545 A.2d at 612–13.

37. *Id.; Wainwright,* 504 A.2d at 1100

38. *See Pennell v. State,* 602 A.2d 48, 52 (Del. 1991) citing *Kornbluth v. State,* 580 A.2d 556, 561 (Del.1990); *Brokenbrough v. State,* 522

A.2d 851 (1987); *Diaz v. State,* 508 A.2d 861, 866 (Del.1986) ("[E]ven when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks.")

39. 427 A.2d 884 (Del.1981).

40. *Id.* at 892.

41. *Id.*

ever been convicted of a crime?" [42] The trial judge sustained a defense objection to this question. On appeal, the defendant argued that it was plain error for the trial judge not to have *sua sponte* stricken from the record the defendant's reference to being on parole and not to have cautioned the jury to disregard the defendant's remark in considering his guilt or innocence.[43] We found no plain error in the trial judge's treatment of the defendant's testimony, noting, in part, that the defendant "was solely responsible for injecting into his testimony his status as a parolee, implying a prior criminal record." [44] We also attributed defense counsel's failure to request a curative instruction to trial strategy.

Here, unlike in *Bromwell*, the defendant did not inject his "familiarity with sex offenses" into his testimony on direct examination. It was the prosecutor who injected this issue on cross examination by phrasing a question in a manner that would leave the jury with the impression that the prosecutor did, indeed, have information in his possession consistent with an affirmative response. Given the flagrant nature of the improper question, Baker's inability to respond with a denial, and the absence of a cautionary instruction, we are satisfied that the facts in this case are sufficiently distinguishable from those in *Bromwell* to render that case unpersuasive.

### CONCLUSION

For the foregoing reasons, we **REVERSE** and **REMAND** for proceedings consistent with this opinion.