IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TRAVIS JONES, | § | |
| | § | No. 534, 2015 |
| Defendant Below- | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1306004908 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: October 19, 2016
Decided: December 5, 2016

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

**ORDER**

This 5th day of December 2016, upon consideration of the parties' briefs, oral argument, and the record of the case, it appears that:

1. Travis Jones appeals his convictions of three counts of Manslaughter. He contends that four comments which the prosecutor made during closing arguments are prosecutorial misconduct which require reversal. We have considered each of the four comments and conclude that they do not warrant a new trial. Therefore, the judgment of the Superior Court will be affirmed.

2. The facts are as follows. On the morning of October 4, 2010, around 5:00 a.m., Travis Jones left 101 Clinton Street, Delaware City, a residence he shared with his girlfriend, Teyonna Watts, and their two small children. Elizabeth Brand and her

family lived at 103 Clinton Street, a residence connected to 101 Clinton Street. Shortly after 5:00 a.m., Ms. Brand smelled smoke. She went outside and saw flames coming out of the back of 101 Clinton Street.

3. Less than a mile away, James Pollinger was picking up his co-worker, Charles Hitchens, from his house in Delaware City. They were both volunteer fire fighters. They noticed the fire on Clinton Street and went there to see whether there was anything they could do. When they arrived, they observed flames coming out of the rear windows. They were informed by a neighbor that 101 Clinton Street was occupied and that children might be inside. However, due to heavy heat, smoke, and the fact that they did not have fire fighting clothing or equipment, they were unable to enter the building.

4. Fire fighters from the Delaware City Fire Department then arrived. Fire fighter Brad Speakman, equipped with an air pack, was able to work his way through the residence from the front to the back. Hitchens was able to hand Speakman a hose through a rear window. Speakman was then able to extinguish the fire, which was located in the kitchen. Teyonna Watts and her two children were rushed to Christiana Care Hospital, but all died that day from smoke inhalation.

5. Shortly after Ms. Watts and the two children arrived at the hospital, Travis Jones arrived. He was taken to the room where efforts were being made to revive one of the young children. Dr. Kevin Geffe, who was in the room, observed that Jones

2

was very distressed and emotional. The doctor also noticed that Jones had a very pungent smell of alcohol. He explained to Jones that the child could not be revived. Eventually, efforts to treat the child were discontinued and Dr. Geffe offered for Jones to hold the child. Jones did hold the child and within moments the child died. Jones then said to the doctor, "I can't believe this happened. This is my fault. I did this."[1] Dr. Geffe attempted to console Jones and reassure him it was an accident. Jones responded, "no, you don't understand this. I did this."[2]

6. There was evidence that Jones made other statements which appeared to connect him to the fire. Jones allegedly told a friend of Ms. Watts that he and Ms. Watts had consumed cocaine and other drugs the night before the fire, and that "he might have killed his family."[3] He explained to the friend that he might have left the stove on after lighting a cigarette. An expert retained by the State, however, testified that the stove was turned off and could not have caused the fire. Jones told a friend of his, Jeremy Kokotaylo, that "I did it . . . I believe I killed the kids," but that "he didn't mean to."[4] After he was arrested, Jones allegedly told his cell mate at the Young Correctional Facility, Robert Valentine, that "he set his peoples on fire," and that "if he wasn't high, he wouldn't have been able to do it."[5] Valentine testified that

---

[1] App. to Answering Br. at 21.
[2] *Id.*
[3] *Id.* at 25.
[4] App. to Opening Br. at 86.
[5] *Id.* at 97.

Jones revealed the following:

> So, he said after he smoked [PCP], he went home, he went in the house, he said he instantly went to the kitchen, pulled the stove out, he said he busted the gas line on the back of the stove, he said he sparked a flame and the whole back of the stove, the wall at the back of the stove lit on fire. And he said after that, he said that the kitchen caught on fire. I guess in minutes, he left out of the house, he said he went to the back of his house and watched the whole back of the house just light on fire.[6]

He also allegedly told his cell mate that he had disarmed the fire alarms in the residence. A state fire marshal testified that a battery in a fire alarm on the second floor had been "retracted from the contacts."[7] When he pushed the battery back into its proper position, the alarm worked.

7. Another expert, ATF Special Agent Paul Gemmato, testified that the fire started on the north side of the kitchen, although he could not identify the ignition source and did not detect whether any accelerants had been used. He did testify, however, that the "fire was incendiary . . . deliberately set with the intent of lighting a fire where it should not be set."[8]

8. There was also evidence that Jones and Watts had a tumultuous relationship, with allegations of infidelity. There was testimony from a friend that the day prior

---

[6] *Id.* at 98.
[7] App. to Answering Br. at 22.
[8] *Id.* at 40a.

to the fire, Watts mentioned that she and Jones had been arguing and that Watts had planned on moving into her grandmother's house. Watts also informed the friend that she might bring the children over to spend the night due to the fighting.

9. Jones was indicted on three counts of Murder in the First Degree and one count of Arson in the First Degree. The jury convicted him of three counts of Manslaughter as lesser-included offenses to the three Murder charges. He was acquitted on the Arson charge.

10. As mentioned, on appeal Jones complains of four comments made by the prosecutor during closing arguments. Defense counsel made a timely objection to each of the four comments. "If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial . . . we essentially review for 'harmless error.'"[9] Under the harmless error analysis, we first conduct a *de novo* review of the record and determine if misconduct occurred.[10] If we determine there was no misconduct, the analysis ends.[11] However, if we determine that there was misconduct, we then determine whether the defendant's substantial rights were prejudicially affected by the misconduct.[12] "Only improper comments or conduct that

---

[9] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).
[10] *Id.*
[11] *Id.*
[12] *Id.* at 149.

5

prejudicially affect the defendant's substantial rights warrant a reversal of his conviction."[13] To make this determination, we apply the three-factor test established in *Hughes v. State* which includes "the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps taken to mitigate the effects of the error."[14]

Where the prosecutorial misconduct 'fails' the *Hughes* test . . . and otherwise would not warrant reversal, we examine *Hunter* - the third step in the harmless error analysis for prosecutorial misconduct - considering whether the prosecutor's statements or misconduct are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.[15]

11. The first comment complained of concerned the testimony of a defense expert, Robert Paul Bieber, Director of the Arson Research project. He was called to analyze the reliability and validity of Agent Gemmato's fire investigation. He testified that the National Fire Protection Association ("NFPA") sets the standard for scientific-based investigation and analysis of fire incidents in the Guide for Fire and Explosion Investigations known as NFPA 921. To demonstrate how a fire develops,

---

[13] *Id.*

[14] 437 A.2d 559, 571 (Del. 1981) (quoting *Dyson v. United States*, 418 A.2d 127, 132 (D.C. 1980)).

[15] *Baker*, 906 A.2d at 149 (citing *Hunter v. State*, 815 A.2d 730, 733 (Del. 2002)).

Bieber prepared a slide show presentation using NFPA 921 illustrations that depicted the progression of a hypothetical fire at different time intervals. On cross-examination, Bieber acknowledged that his illustrations were in color, whereas the illustrations in the 2014 edition of NFPA 921 were not. He also testified that time interval notations on his slides, which apparently included use of the letter T, may have been taken from an older version of NFPA 921. He also discussed a fire dynamic known as "flashover," which occurs in enclosed rooms "where the heat from [the] trapped thick layer of smoke radiating down onto the floor will ignite every combustible item in the room nearly simultaneously."[16] When that occurs, the phenomenon becomes known as "full-room involvement."[17] One of the issues in the trial was the precise origin of the fire in the kitchen, and the flashover discussion was relevant to that issue. Bieber believed that because neither the ignition source nor the first fuel ignited could be determined, the cause of the fire could not be determined.

12. In closing argument, the prosecutor made the following statement:

> The State introduced the last slide in that series from NFPA 921 when Mr. Gemmato testified. There's no T equals anything. Mr. Gemmato testified that, in NFPA 921, 2008, I think maybe 2004, 2008, 2011, 2014, those pictures which are showing the development of flashover fire to full-room involvement have no time sequence on them

---

[16] App. to Opening Br. at 124.
[17] *Id.* at 125.

whatsoever. But Mr. Bieber told you that it came directly from NFPA 921. When an expert comes before you and he is espousing a theory and using documents to prove his theory, and they are wrong, his credibility – [18]

Defense Counsel then objected on the ground that the slides used by Mr. Bieber were not "wrong," but rather that the time intervals do not appear in the 2014 edition of NFPA 921.[19] The trial judge sustained the objection and instructed the prosecutor to be more accurate in characterizing the slides. The prosecutor then continued his closing argument as follows:

So, Mr. Bieber came in and showed those slides. And the times that were listed on those slides – besides the color, 921 doesn't have any color, someone colored them in with brown – who knows. But more importantly, those times are not in NFPA 921.[20]

While characterizing the slides as "wrong" was objectionable as found by the trial judge, we do not believe that the prosecutor's use of the word "wrong" rises to the level of prosecutorial misconduct. In addition, this portion of the prosecutor's argument did not prejudice Jones. We believe it was made quite clear to the jury that the slides used by Mr. Bieber simply differed from the slides as they appear in NFPA 921 because of notations which he added.

---

[18] *Id.* at 133.
[19] *Id.*
[20] *Id.* at 134.

8

13. The second comment complained of relates to a study prepared by a former ATF agent, Steve Carmen, which was discussed by Mr. Bieber during his testimony. The Carmen study was a controlled experiment conducted at the ATF lab. In the study, a room was subjected to flashover conditions, and 53 fire investigators were asked to determine which quadrant within the room contained the fire origin. Apparently 93 percent chose the wrong quadrant. The prosecutor made the following statement about the Carmen study in his closing argument:

> And, then, [Mr. Bieber] talked, if you remember, about this exercise rate from a study done by a guy by the name of Steve Carmen. And he talked about in flashover and post flashover, there's a 93-percent error rate in the study. Fire investigators going to fire scenes that are post flashover, they got it wrong 93 percent of the time.[21]

Defense counsel then objected, pointing out that the study was not about fire investigators going to fire scenes, but about a controlled experiment at the ATF lab. The prosecutor explained to the trial judge that he would correct that, that it was his mistake. He then continued as follows:

> The Carmen study, the Carmen study was a controlled exercise. I misspoke. It wasn't firefighter investigators going to the scenes, it was a study, 53 fire investigators going to a room that had been set on fire. And they were told to determine what happened, what quadrant did the fire originate in. And Mr. Bieber made it clear that 93

---

[21] *Id.*

9

percent of them got it wrong.[22]

Jones contends that the prosecutor's mischaracterization of the Carmen study was part of an improper, calculated strategy to discredit the defense expert's testimony. He bases this contention on the fact the state retained Carmen as a trial consultant and attempted to utilize him as a fact witness. Thus, Jones argues, the State was well aware of the contents of Carmen's study. We are satisfied, however, that the prosecutor's error, made during a 16 day trial, was a mistake on the prosecutor's part, which he corrected when brought to his attention.

14. The third comment complained of occurred during rebuttal. The prosecutor, in discussing the testimony of Robert Valentine, made the following statement, which was followed by a sidebar conference:

> There is a consistency there because there is a consistency of his making. Those are his statements. [Defense counsel] says is it fair to Travis Jones to convict him based on Robert Valentine's statement. Is it fair to Teyonna, to Breyonna –
>
> [Defense Counsel]: Objection
>
> The Court: Come forward.
>
> (Sidebar conference)
>
> [Defense Counsel]: This is so clearly improper. [The

---

[22] *Id.*

prosecutor] is an experienced prosecutor. He knows that you are not allowed to ask a Jury to have sympathy for a victim. "Is it fair to the victim, is it fair to Teyonna."

[The Prosecutor]: Your Honor, my statement was going to be that you are the judges of the facts. Robert Valentine is a criminal. You get to judge the credibility of the evidence, and that is what the State is asking you to do.

[Defense Counsel]: That's not what he said.

The Court: You didn't say that. I am going to give the instruction to disregard the last part.

(End of Sidebar conference)

The Court: Ladies and Gentlemen, you are to disregard that last question.[23]

The prosecutor's comment was prosecutorial misconduct. It is elementary that it is improper for an attorney to ask the jury to sympathize with either a victim or the defendant. The prosecutor's response to the objection at sidebar seems quite questionable since it does not seem to have anything to do with what he said to the jury. If the prosecutor was bothered by something defense counsel said in defense counsel's closing, his remedy was to object at that time. Notwithstanding our disapproval of the prosecutor's comment, we do believe that the trial court's curative instruction, given immediately following the comment, was sufficient to mitigate any

---

[23] *Id.* at 135.

11

prejudice to Jones.

15. The final comment complained of, also made in the State's rebuttal, has been characterized as the "Walking through the Fire" comment. It involves the activities of fire fighter Brad Speakman. The prosecutor stated:

> Mr. Beiber wants you to say – says you can't determine this fire because it's a flashover, full-room involvement. And you have heard enough to have some sense of that more than you probably ever wanted to know. Mr. Gemmato says this room did not go to flashover, did not go to full-room involvement, because there's not even burning; It's not floor to ceiling; There's undamaged areas. The one thing they both agreed on is a firefighter could not walk through a room that's in flashover or full involvement and survive because the heat is too great. And maybe Mr. Bieber forgot that Brad Speakman said when he got into that house he walked through the kitchen to get the hose to suppress the fire. This was not full-room involvement. This was what Mr. Gemmato said: "The origin on the north wall, where the defendant put himself" -- [24]

Defense counsel then objected, arguing that the evidence was that Speakman walked through a portion of the house that did not catch fire, but did not walk through the kitchen. Defense counsel also argued that he was being sandbagged, because it was a point which he had not discussed in his closing. After an extensive sidebar, the prosecutor resumed his argument, first mentioning to the jury that the jurors' recollection controlled what the testimony of Mr. Speakman had been.

---

[24] *Id.* at 136.

16. The record shows that Speakman's testimony was that he entered the building through the front door and made his way to the "rear of the structure, which was another door to get into where I found most of the fire at."[25] He then said that "[o]nce I went in there, the room was involved with fire. So I went to this Bravo side window so I could knock that fire down."[26] He then said he received a hose through a window and put the fire out. By inference, the room he "went in" was the kitchen. While his testimony does not indicate whether he walked across the room from one side to the other, it does create an inference that he at least walked into the kitchen. We think that the prosecutor's comment was fair argument of the evidence and fair rebuttal of the flashover argument.

17. We therefore conclude that none of the comments complained of warrant a new trial.

18. The State has filed a cross-appeal in which it argues that the trial judge improperly limited the scope of its cross-examination of a defense witness and improperly prohibited the State from calling a rebuttal witness. The cross-appeal was filed pursuant to 10 *Del. C.* § 9902(e) on October 16, 2015. Such a cross-appeal must be "personally authorized by either the Attorney General or the Chief Deputy

---

[25] *Id.* at 47.
[26] *Id.* at 48.

Attorney General."[27] It appears from the record that neither the Attorney General nor the Chief Deputy Attorney General personally authorized the filing of the cross-appeal. The State's cross-appeal is, therefore, procedurally defective. After Jones pointed out this defect in his answering brief on cross-appeal, the State obtained the personal authorization of the Chief Deputy Attorney General, which was filed in the State's appendix to its reply brief on cross-appeal on October 16, 2016. The purpose of the statute is to ensure that either the Attorney General or the Chief Deputy Attorney General gives his or her personal consideration to the filing of the appeal before it is filed. We do not think that personal authorization given after the appeal is filed cures this defect. Accordingly, the State's cross-appeal is dismissed. Even assuming the appeal had been properly authorized, it does not address a recurring issue of material importance and therefore is not a proper subject for consideration since we have decided that Jones' convictions should be affirmed.

NOW, THEREFORE, IT IS THE ORDER of the Court that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ James T. Vaughn, Jr.
Justice

---

[27] 10 *Del. C.* § 9902(g).

14