IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JARREAU AYERS, | § | |
| | § | No. 436, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1710003395 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 17, 2021
Decided: April 22, 2021

Before **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware, for Appellant, Jarreau Ayers.

Sean P. Lugg, Esquire, Delaware Department of Justice, Wilmington, Delaware, for Appellee, the State of Delaware.

**VAUGHN**, Justice:

The Appellant, Jarreau Ayers, was convicted in the Superior Court of one count of Riot, two counts of Assault First Degree, four counts of Kidnapping First Degree, and one count of Conspiracy Second Degree for his participation in the February 1-2, 2017 inmate takeover of C Building at the James T. Vaughn Correctional Center (JTVCC). Ayers was found guilty of these offenses following a sixteen-day jury trial. On appeal, he makes one claim. He contends that the trial judge erred by not curing prosecutorial misconduct which occurred during the State's rebuttal argument.

At trial, Ayers claimed that he was not a participant in the planning and execution of the takeover and was outside of C Building in the recreational yard when the takeover took place. The alleged improper argument came when the prosecutor said to the jury, "[y]ou spent the better part of the last month with Jarreau Ayers. What about Mr. Ayres suggests that . . . he's not going to do exactly what he wants to do, which is to go inside and join in what's happening there."[1] Ayers contends that this part of the rebuttal argument was improper because it asked the jury to consider Ayres' character in the courtroom as observed by the jury during the trial. Ayers objected to the prosecutor's statement, but his objection was overruled. After consideration of the record and the parties' arguments, we have concluded that the trial judge's failure to take steps to cure any alleged prejudice caused by the

---

[1] App. to Appellant's Op. Br. at A2592 [hereinafter A__].

2

prosecutor's comment, if error, is harmless error.   Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

The evidence during this lengthy trial was extensive, and we summarize it only as needed to consider Ayers' one claim on appeal.   On February 1, 2017, inmates housed within C Building of the JTVCC rebelled against C Building living conditions and took over the building (the "Riot").   The Riot lasted until the following day, February 2.   During the Riot, inmates attacked and forced correctional officers Winslow Smith and Joshua Wilkinson into a storage closet; they forced institutional counselor Patricia May into a prison cell; and several inmates attacked Sergeant Steven Floyd, which ultimately resulted in his death in the building.

Ayers was one of eighteen defendants charged in connection with the Riot. He was indicted on eleven offenses: one count of Riot, three counts of Murder First Degree (as to Sgt. Floyd), two counts of Assault First Degree (one count each as to C.O. Wilkinson and C.O. Smith), four counts of Kidnapping First Degree (one count each as to Sgt. Floyd, C.O. Wilkinson, C.O. Smith, and counselor May), and one count of Conspiracy Second Degree.   At the time, Ayers was serving two life sentences for prior convictions.

Because of the high number of defendants charged, the case was tried in separate trial groups.   Ayers was placed in trial Group One along with co-

3

defendants Dwayne Staats, Roman Shankaras, and Deric Forney.

Prior to trial and after receiving a witness list from the State, Ayers' attorney wrote to the court explaining that the list revealed a conflict of interest on his part. One of his former clients in a capital murder case would be testifying for the State and would directly implicate Ayers. The court permitted Ayers' counsel to withdraw, but left Ayers in Group One. Ayers then elected to proceed *pro se* at trial with stand-by counsel.

In total, forty-five witnesses testified at Group One's trial, including the three surviving victims (C.O. Wilkinson, C.O. Smith, and counselor May), three workers who happened to be performing maintenance in the basement when the takeover took place, responding police officers and investigators, cooperating inmates, and the Group One defendants.[2]

Most of the testimony pointing to which inmates played what role or took what action came from the cooperating inmates. As noted by both parties in their briefs, some of this testimony is conflicting. However, many inmates pointed to Ayers, Royal Downs, and Dwayne Staats as those responsible for facilitating or leading the Riot. For example, several inmates pointed specifically to Ayers as having requested locker boxes from inmates (which were used as barriers to

---

[2] During the trial, issues arose between Shankaras and his attorney, and his case was severed to be tried at a later date, leaving Staats and Forney as Ayers' trial codefendants.

responders), as having decided which inmates would be permitted to leave the building while the inmates controlled it, and as having called everyone in from the recreation yard to C Building when the Riot started. One inmate identified Ayers as one of Sgt. Floyd's assailants. As previously mentioned, Ayers' claim was that he was not involved in the takeover of C Building. He testified that he was in the recreational yard when the takeover occurred and that the leaders of the takeover "chose for me not to be there."[3] He testified that he entered the building from the yard after the takeover had become an accomplished fact and he denied being involved in the murder of Sgt. Floyd or the charged assaults and kidnappings.

After the Riot began, the Department of Correction negotiating team established radio communication with the rioters. Brett Smith, a member of the crisis negotiation team, testified that he negotiated with inmates by radio from approximately 12:00 p.m. until 8:55 p.m. on February 1. He negotiated primarily with Royal Downs. During the trial, while Smith was testifying, the State introduced three "clips" from the recordings of the radio transmissions. On the three clips, the voices of Royal Downs, counselor May, and Ayres can be heard. The significance of Ayers' voice on the radio transmission is discussed below.

During his closing, Ayers again denied any involvement in the planning or execution of the takeover. The State's response in rebuttal included the following:

---

[3] A2306.

5

He heard the sounds from inside the building, the violent takeover had begun. But yet his testimony was that he was left to stay in the yard, he couldn't go inside. He was going to wait while his loved ones were inside doing what he knew, and endorsed, happening.

You spent the better part of the last month with Jarreau Ayers. What about Mr. Ayers suggests that he is that person? That he's not going to do exactly what he wants to do, which is to go inside and join in what's happening there.[4]

After rebuttal concluded, Ayers objected, contending that the prosecutor's argument implicated his character as exhibited in the courtroom throughout the trial.

The court disagreed:

Mr. Ayers: Hold on. Your Honor, my objection is more towards [the prosecutor] stated to the jury that they've been sitting here watching me for four weeks. And that somehow my character, you know - - what about my character?

No evidence was presented during this trial about my character. I don't understand - - I feel as though some type of instructions should be given to the jury in regards to that. That, you know, me sitting here, somehow, you know, the way that I portrayed myself or something, this automatically makes me guilty.

I don't feel as though my character came up at all in this trial in regards to testimony.

The Court: I think the argument that was being made, sir, is that the evidence, either through the witnesses or through what was said through the walkie-talkie, is that reflective of the same person who says they were not

---

[4] A2591-92.

involved.

> So I didn't read [the prosecutor] implying that simply because you're an inmate, that they shouldn't believe you. I think his characterization was in reference to what other witnesses said and your comments that were made in other evidence that was presented.
>
> Mr. Ayers: He didn't say nothing about the witnesses. He said, "Y'all been watching him."
>
> The Court: Well, to the extent that you have an objection, it's overruled. Okay?[5]

The trial judge's reference to the walkie-talkie appears to be a reference to Ayers' voice on the radio. During his testimony, Ayers explained the context of his voice on the radio clip. He testified that after he entered the building and while the inmates still controlled it, he was on the radio coordinating the exit from the building of inmates with medical conditions that needed attention. He testified that he opened the door to try to let inmates with medical conditions out. When he did so, however, according to his testimony, officers who were "all black suited-up, helmets, guns, they rush[ ]"[6] and Ayers slammed the door shut. He explained that this is where the jury hears him "snap out" (i.e., become extremely angry) while speaking on the radio because he, Ayers, was "trying to do the right thing."[7]

The jury found Ayers not guilty of the Murder First Degree charges and guilty

---

[5] A2606-07.
[6] A2317.
[7] *Id.*

7

on all the other charges.

Ayers argues on appeal that the prosecutor's comments in rebuttal closing improperly invited the jury to consider his character based upon their observations of his conduct in the courtroom during the trial. He further argues that "[i]t was error for the judge to fail to instruct the jury that their verdict should be based only on the evidence presented at trial and not on [his] demeanor or character as a *pro se* defendant."[8]

### III. STANDARD OF REVIEW

[O]ur standards for reviewing prosecutorial misconduct are slightly different depending on whether the issue was fairly presented below. If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for "harmless error." If defense counsel failed to do so and the trial judge did not intervene *sua sponte*, we review only for plain error.

The first step in the harmless error analysis involves a *de novo* review of the record to determine whether misconduct actually occurred. If we determine that no misconduct occurred, our analysis ends there. If, however, we determine that the trial prosecutor did engage in misconduct, we move to the second step in the analysis, because not every instance of prosecutorial misconduct requires reversal. Only improper comments or conduct that prejudicially affect the defendant's substantial rights warrant a reversal of his conviction. To determine whether prosecutorial misconduct prejudicially affects a defendant's substantial rights, we apply the three factors

---

[8] Appellant's Op. Br. at 53.

of the *Hughes* test, which are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error. The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact sensitive manner.[9]

If the *Hughes* factors are resolved in favor of the State, the Court may then consider, as a separate and additional analysis, whether, under *Hunter*, the prosecutorial misconduct is a repetitive error which is part of a persistent pattern of misconduct occurring in multiple cases over a period of time which casts doubt on the integrity of the judicial process.[10]

## IV. DISCUSSION

This Court has found it improper for a prosecutor to comment on a defendant's courtroom demeanor during trial. In *Hughes v. State*, the defendant, who did not testify at trial, argued that the prosecutor, during summation, "impermissibly depicted his courtroom demeanor as unemotional, unfeeling and without remorse."[11] We concluded that the prosecutor's comments on the defendant's demeanor during trial were improper because the defendant's courtroom demeanor is irrelevant and such comments assume "that there is such a thing as a model of 'normal' courtroom

---

[9] *Baker v. State*, 906 A.2d 139, 148-49 (Del. 2006) (internal citations omitted).
[10] *Hunter v. State*, 815 A.2d 730, 738-39 (Del. 2002).
[11] 437 A.2d 559, 572 (Del. 1981).

behavior. . . . [A] defendant should not be subjected to a guilty verdict because his courtroom appearance did not comport with the prosecution's notion of a norm."[12]

In *Walls v. State*, the defendant did testify at trial. We observed that "it is possible to make proper comments to a jury about the demeanor of a defendant who has testified[,]" but we found the prosecutor's comments about the defendant improper because they were not limited to the context of his demeanor as a witness.[13]

There is some ambiguity in the prosecutor's comments in this case. The trial judge said that he thought the comments were made in reference to what witnesses had said about Ayers or what he said during the radio transmission.

The State argues that Ayers, in his own testimony, "implored the jury to consider his demeanor throughout the trial when assessing his role in the uprising."[14] The State points to Ayers' testimony where he discussed the recording of the radio transmission with responder Brett Smith:

> And that's when you hear the clip on the walkie-talkie where I snap out. I tell Brett Smith, he was on the stand, I said - - you know, I'm not going to insult your intelligence. That was me on the walkie-talkie at that time.
>
> And I go into - - *I mean, y'all been watching me at the trial*, I can get emotional at times. But I go into - - I snap

---

[12] *Id*.
[13] 560 A.2d 1038, 1051 (Del. 1989). However, because in *Walls* no objection was made at trial, the prosecutor's comments were reviewed for plain error. The *Walls* Court found that the prosecutor's comments, when viewed in context of the case, did not amount to plain error.
[14] Appellee's Ans. Br. at 30.

out.    Because my thing is, like I said it - - y'all go back and y'all get to listen to that clip.    I'm p----d.[15]

Therefore, the State argues, "[i]t was not improper for the prosecutor to carry the baton offered by Ayers to conclusion in summation."[16]

We resolve this ambiguity by accepting for the sake of argument Ayers' claim that the prosecutor's comments improperly invited the jury to consider his demeanor and character based upon their observations of him in the courtroom during trial and were not directed to his demeanor as a witness.

Accepting Ayers' claim that the comments were improper, however, does not result in reversal of Ayers' convictions.    As mentioned above, not every instance of prosecutorial misconduct requires reversal.    Applying the *Hughes* factors, it does not seem to us that this was a very close case.    Several inmates pointed to Ayers as having an active role in the Riot.    Witnesses identified Ayres as a facilitator of the Riot, moving inmates into the building from the yard, collecting storage boxes arranged as barriers, and deciding who could leave the building and when.    We are not persuaded that the comments had any appreciable effect upon any of the issues central to the jury's consideration of whether Ayers was guilty or not guilty of the charges against him.    His participation in the Riot justified his convictions as an accomplice to the kidnapping of Sgt. Floyd, C.O. Wilkinson, C.O. Smith, and

---

[15]  A2317 (emphasis added).
[16]  Appellee's Ans. Br. at 33.

11

counselor May and the assaults upon C.O. Wilkinson and C.O. Smith. We also conclude that the first two *Hughes* factors greatly outweigh the absence of any corrective action on the part of the trial judge. The prosecutor's comments are unique to this case, making a *Hunter* analysis inapplicable.

## V. CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is affirmed.