IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONNELL L. SEENEY, | § | |
| | § | No. 323, 2021 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos. N1911000982 |
| STATE OF DELAWARE, | § | N1910008005 |
| | § | |
| Appellee. | § | |

Submitted: September 14, 2022
Decided: October 20, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, and **VAUGHN**, Justices.

# **O R D E R**

On this 20th day of October 2022, it appears to the Court that:

(1) The defendant-appellant, Donnell Seeney ("Seeney"), appeals his convictions for Offensive Touching (two counts), Breach of Conditions of Bond During Commitment, Misuse of Prisoner Mail, and Stalking. He makes three claims. First, he claims that during opening and closing argument, the State impermissibly shifted the burden of proof to him when it implied that he admitted putting his hand on the victim's neck. Next, he claims that the Superior Court erred when it denied his motion for a mistrial after the victim made references in her testimony to allegations that Seeney threatened her son. Finally, he claims that the combination

of these errors and their cumulative impact substantially affected his right to a fair trial, warranting a reversal. For the reasons that follow, we have concluded that the Superior Court's judgment should be affirmed.

(2) On October 12, 2019, Simone Harris ("Harris") held a get-together for Donnell Seeney's birthday. Harris and Seeney had been a couple for approximately two years at the time, and Seeney had moved into Harris's house earlier that year. Harris testified that she had not been feeling well that day, and after most of the guests had left her house, she went upstairs to lie down. While Harris was resting, Seeney entered the room and tried to initiate sexual intercourse with her. Harris declined his advances.

(3) Later that night, Seeney's brother, whom Harris had never met, came to the house. Seeney asked Harris to come downstairs to meet his brother. Harris obliged and went downstairs to meet and talk with him. During this interaction, Harris testified that Seeney became visibly irritated and went back upstairs. Seeney then called Harris to come upstairs, and when she did, he said to her, "I thought you was f-----g sick" and proceeded to call her derogatory names.[1] She testified at trial that when she attempted to leave the room, Seeney grabbed her by the shoulders and threw her onto the bed. She then testified that he put one hand around her neck and

---

[1] App. to Appellant's Opening Br. at A41.

began "choking" her for about ten seconds, to the point that she could not breathe.[2] Once Seeney stopped, Harris tried to get off the bed and Seeney again grabbed her, pushed her onto the bed, and began choking her again, this time for a shorter period.

(4) Harris attempted to grab her phone and keys from the bed, but Seeney blocked her way. When she was eventually able to leave the room, Harris went to a friend's house in the neighborhood to call the police. Two police officers interviewed Harris at her friend's house and took photos of her neck, which did not show any visible marks or injuries. By the time the police went to Harris's house to interview Seeney, he had left. Seeney was not arrested for these events until November 2, 2019.

(5) Seeney attempted to communicate with Harris everyday leading up to his arrest. He sent many text messages to Harris, both professing his love and threatening her, as well as allegedly threatening her son. In one exchange, Harris wrote to Seeney, "I wish you didn't put your hand around my throat like that. We could have worked on the other issues, but now I'm afraid to be around you. It may happen again."[3] Seeney replied, "I was wasted but that's no excuse."[4]

(6) While Seeney was in prison after his arrest, he sent several letters to

---

[2] *Id.* at A43-45.
[3] *Id.* at A60-61.
[4] *Id.* at A61.

Harris. Some were intercepted by police and Harris turned others over to police.[5] In several letters, Seeney made threats towards Harris, asking her to drop the charges and leave the State. Seeney also allegedly made threats towards Harris's son.

(7) On March 2, 2020, a grand jury indicted Seeney for Strangulation, Terroristic Threatening, Offensive Touching, Non-Compliance with Bond Conditions, Breach of Conditions of Bond During Commitment, Misuse of Prisoner Mail, and Stalking. Seeney's jury trial took place over a two-day period. In its opening, the State highlighted the text messages that Seeney sent to Harris following the incident. The prosecutor said,

> Those text messages include threats on her life, they include apologies.
>
> What they do not include is any statement that this didn't happen. When Ms. Harris texts the defendant, I didn't like the way you put your hand around my throat, his response is [not], I did not–I didn't do. His response is, I was wasted, but that's no excuse.[6]

The prosecutor repeated this statement in her closing. The defense objected at closing, noting that the State made the same statements in opening, and argued that the statements amounted to improper burden shifting. The prosecution argued that the text message was tantamount to a confession and the jury was able to draw an inference from the statement. The court overruled the defense's objection, finding

---

[5] The letters that Harris handed over were not the subject of a criminal charge and were only admitted to the court as evidence of consciousness of guilt, and the court so instructed the jury.
[6] App. to Opening Br. at A18.

4

that the statement did not shift the burden of proof to the defendant.

(8) The prosecution also introduced some letters and text messages from Seeney that included threats towards Harris's son. Pursuant to D.R.E. 403, any threats to Harris's son were redacted from the documents, and the defense understood that there was to be no reference to the threats at trial. During Harris's cross-examination, defense counsel asked her, "You picked out what text messages to give to the State; correct?"[7] In response, Harris stated, "I sent them the text messages that showed him threatening my son and the ones where I . . . pretty much showed that he strangled–well, not denying strangling me."[8] Later in cross-examination, defense counsel asked Harris about the letters she gave police and stated, "You don't know which letter goes with what date or what other letter; correct?"[9] Harris responded, "Well, the two with the threats to my son, I specifically kept them in the envelope that they came."[10] At this point, defense counsel requested a sidebar and asked the court to grant a mistrial because Harris had mentioned the threats to her son. The prosecution argued that the defense had opened the door to Harris's comments when it asked her to identify the letters. She apparently could not identify them by date, the State argued, and unfortunately identified them by

---

[7] *Id.* at A140.
[8] *Id.* at A140.
[9] *Id.* at A142.
[10] *Id.*

5

their references to threats to her son. The defense argued that it had not opened the door to Harris' comments and that she was aware that she was not supposed to mention threats to her son. The court denied the motion for a mistrial, but provided a curative instruction informing the jury to disregard all of the statements about Harris's son.

(9) The jury eventually convicted Seeney of two counts of Offensive Touching (one as the lesser-included offense of Strangulation), Breach of Conditions of Bond During Commitment, Misuse of Prisoner Mail, and Stalking. He was acquitted of the remaining charges. He was sentenced as a habitual offender.

(10) The standard of review for claims of prosecutorial misconduct depends on whether the issue was fairly presented below.[11] "If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for harmless error."[12] If, on the other hand, defense counsel failed to object and the trial judge did not intervene *sua sponte*, "we review only for plain error."[13] Regardless of the standard of review, however, we must first conduct a *de novo* review to determine whether misconduct actually occurred.[14] If no misconduct occurred, then the

---

[11] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006) (en banc).
[12] *Id.* (internal quotation marks omitted).
[13] *Id.*
[14] *Id.* at 148, 150.

analysis ends under either standard.[15]

(11) Seeney's first argument is that the prosecutor's references to Seeney's lack of a denial to Harris' text message stating that Seeney had put his hand around her neck was improper burden shifting in violation of the Fourteenth Amendment of the U.S. Constitution and Article I Section VII of the Delaware Constitution, warranting a reversal. Seeney asserts that when the prosecution stated in both its opening and closing that Seeney did not deny in the text messages that he attacked Harris, it improperly shifted to Seeney "an obligation to show that the road to reasonable doubt could only be taken by the jury if he testified and denied the allegations."[16] The prosecutor's statements, Seeney argues, created an unavoidable implication for the jury that an absence of an affirmative denial equated to an admission. Therefore, the only way Seeney could prove his innocence was by testifying. In response, the State argues that the prosecution is permitted to draw inferences from the evidence presented, and the prosecutor's comments were a legitimate inference based on the evidence and not a comment on Seeney's failure to testify.

(12) We do not find that the prosecutor's statements amount to improper burden shifting. "In a criminal case, it is the State's burden to prove to the jury's

---

[15] *Id.*
[16] Opening Br. at 9.

7

satisfaction that there is no reasonable doubt that the defendant committed the crime."[17] In making its case, the State cannot intentionally "misstate the evidence or mislead the jury as to the inferences it may draw."[18] The prosecution can, however, argue "all legitimate inferences that follow from the evidence."[19] "The inferences, however, must flow from the evidence presented."[20]

(13) In this case, the comments made by the prosecutor in her opening and closing were legitimate inferences that flowed from the evidence presented. When confronted Harris's text statement that Seeney had his hand on Harris's neck, Seeney did not deny the allegation, but gave an excuse for his behavior—that he was "wasted but that's no excuse."[21] A reasonable inference can be drawn from this statement that Seeney was acknowledging that he did, in fact, put his hand on Harris's neck. As this is a legitimate inference from the evidence presented and not a comment on Seeney's failure to testify, it did not shift the burden to Seeney to pronounce his innocence and testify at trial. Therefore, we would find that no prosecutorial misconduct occurred.

(14) Seeney next argues that the Superior Court erred in not granting a mistrial when Harris referenced Seeney's threats toward her son. Seeney points to

---

[17] *Hughes v. State*, 437 A.2d 559, 567 (Del. 1981).
[18] *Id.*
[19] *Burns v. State*, 76 A.3d 780, 789 (Del. 2013).
[20] *Id.*
[21] App. to Opening Br. at A61.

8

the four factors this Court enumerated in *Pena v. State*[22] to consider whether a mistrial should be granted in response to an allegedly prejudicial remark by a witness: (1) the nature and frequency of the comment; (2) the likelihood of resulting prejudice; (3) closeness of the case; and (4) the adequacy of the trial judge's actions.[23]  As to the first factor, Seeney argues that the prejudicial remark was central to Seeney's character, and the source of the comment was from the victim, adding to its weight.  These "repeated"[24] prejudicial remarks, Seeney argues, are likely to make the jury believe Seeney is a "bad person,"[25] making the jury more likely to believe he committed the crime.  As to the closeness of the case, Seeney argues that the State's case rested on the credibility of Harris, as there was little physical evidence, and the fact that the jury acquitted Seeney of Strangulation and convicted him on the lesser-included offense of Offensive Touching shows how the jury struggled with the case.  Seeney further argues that the curative instruction was inadequate.  Although defense counsel made a prompt objection to the remarks, Seeney contends that while the parties discussed the objection at a sidebar, the jury was "left pondering the nature of Seeney's alleged threats."[26]  Essentially, the "bell [had been] rung"[27] and the curative instruction was insufficient.

---

[22] 856 A.2d 548 (Del. 2008).
[23] *Id.* at 550-51.
[24] Opening Br. at 12.
[25] *Id.* at 13.
[26] *Id.* at 14.
[27] *Id.*

(15) This Court reviews a "trial court's denial of a motion for a mistrial under an abuse of discretion standard."[28] "The trial judge is in the best position to assess whether a mistrial should be granted."[29] "A trial judge should grant a mistrial only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[30] "A mistrial is mandated only when there are 'no meaningful and practical alternatives' to that remedy."[31]

(16) Although the statements, made during cross-examination, about Seeney threatening Harris's son had some potential to prejudice Seeney, they were brief and were promptly cured by a curative instruction by the court. The court instructed the jurors to "disregard any testimony that you've heard relating . . . to [Harris's] son or any situation involving the son."[32] This Court has held that a prompt curative instruction is "presumed to cure error and adequately direct the jury to disregard improper statements."[33] In addition, "[j]uries are presumed to follow the trial judge's instructions."[34] We find that the judge's prompt instruction was sufficient to cure any prejudice caused by Harris's statements, and it was not an abuse of discretion for the court to deny Seeney's motion for a mistrial.

---

[28] *MacDonald v. State*, 816 A.2d 750, 753 (Del. 2003).
[29] *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986).
[30] *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974)).
[31] *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994).
[32] App. to Opening Br. at A145.
[33] *Revel v.* State, 956 A.2d 23, 27 (Del. 2008).
[34] *Id.*

10

(17)   Seeney next argues that viewing the errors by the court together, the cumulative effect renders the trial so unfair that he must be granted a new trial. Where there are several errors in a trial, we must weigh the cumulative impact to determine whether there was plain error.[35]   As discussed *supra*, we do not believe that Seeney was prejudiced by any of the errors complained of here.  Therefore, we find Seeney's claim of cumulative error to be without merit.

NOW, THEREFORE, it is the order of the Court that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:


/s/  James T. Vaughn, Jr.
Justice

---

[35] *Michael v. State*, 529 A.2d 752, 764 (Del. 1987) (citing *Wright v. State*, 405 A.2d 685, 690 (Del. 1979)).

11