IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| YONY MORALES-GARCIA, | § | |
| | § | No. 311, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below–Superior |
| | § | Court of the State of |
| v. | § | Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2201010642(S) |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: November 5, 2025
Decided: February 3, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **REVERSED and REMANDED.**

Kimberly A. Price, Esq. (*argued*), COLLINS PRICE WARNER WOLOSHIN, Wilmington, Delaware, *for Appellant Yony Morales-Garcia.*

Julie M. Donoghue, Esq. (*argued*) and Kenneth J. Nachbar, Esq., DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware.*

**GRIFFITHS**, Justice:

On January 22, 2022, two masked men dressed in dark clothing entered a crowded restaurant in Sussex County, Delaware. After one of the men ripped jewelry from around a restaurant patron's neck, the other man shot and killed two people. The State's theory of the crime was that Appellant Yony Morales-Garcia pulled the trigger to protect his brother, Emner Morales-Garcia, who confessed to stealing the jewelry.

The Morales-Garcia brothers were scheduled to be tried separately. Emner accepted a plea offer before trial, pleading guilty to first-degree robbery and second-degree conspiracy. Yony proceeded to trial, and the jury deadlocked. In Yony's second trial, the jury convicted him of seventeen counts, including two counts of first-degree murder. Yony appealed to this Court, raising two claims.

First, Yony claims that the State engaged in two instances of prosecutorial misconduct during trial. The first time was when the State divulged in its opening statement that Emner had "admitted to this crime already" and pleaded guilty to the robbery. The second time was when the State elicited testimony from a detective that Emner had already pleaded guilty to both robbery and conspiracy.

Yony's second claim is an alternative argument. He contends that even if it was proper for the State to mention Emner's admission of guilt to the jury, it was plain error for the court not to instruct the jury of the limited purpose for which it could consider Emner's guilty plea. We agree with Yony that the State's repeated

2

references to Emner's guilt was improper, violated his substantial rights, and jeopardized the fairness and integrity of the trial process. We therefore reverse his convictions and remand for a new trial.

## **BACKGROUND**[1]

As we summarize the trial record, we are mindful that the record contains conflicting narratives.

On January 22, 2022, Jose Ortiz-Perez began drinking around noon at a restaurant on DuPont Highway in Sussex County, Delaware. Jose invited his brother, Feliciano "Ely" Ortiz to join him at the restaurant for lunch. Two other acquaintances joined them as well. By the time Jose left the restaurant, he had consumed "more than 15 beers"[2] and his recollection of the night was a "little bit fuzzy."[3]

By early evening, several other groups were seated in the restaurant. Seferino "Frank" Garza and his friends were seated at a table near the restaurant's backdoor. Frank's table included Armando Chilel-Lopez. At another table, a father and his son, Andy Velasquez, sat and chatted with friends.

---

[1] Because multiple individuals in this case have the same last name, we will use first names, after the individual has been introduced, to avoid confusion.

[2] App. to Opening Br. at A437 [hereinafter "A__"] (Trial Tr. 123:9–22 (Jose Ortiz-Perez) [hereinafter "Tr."]).

[3] A438 (Tr. 124:13–22) (Jose Ortiz-Perez).

3

Back at his table, Jose was drunk.[4] He angrily spewed profanities and argued with patrons.[5] For reasons unknown, Jose pointed at Andy and shouted – "Andy, I'm going to [f…] you up!"[6] Jose's belligerence resulted in the owner of the restaurant asking Jose, Ely, and their friends to leave. As Ely walked out of the restaurant, he threatened Andy's table. While Jose's party stood outside the restaurant, Honorio Velasquez walked in and sat at Andy's table.

Outside the restaurant, Ely was ready to fight and was "looking for trouble."[7] He called Yony Morales-Garcia for "backup."[8] Ely told Yony that Andy was at the restaurant. Ely knew that Yony and his brother, Emner Morales-Garcia, held a grudge against Andy from a prior dispute. Yony drove to the restaurant with Emner to meet Ely.

Before the Morales-Garcia brothers arrived, Jose's party piled into a grey Ford pickup truck and drove to a liquor store. Afterwards, Ely returned to the restaurant but parked next door at a gas station. Ely claims that he did so because a friend thought he left his car keys inside the restaurant. Yet no one in their party entered

---

[4] *See, e.g.*, A383–85 (Tr. 69:6–71:22) (Aroldo Figuero Perez); A431 (Tr. 117:21–22) (Selvin Morales-Ortiz); A463 (Tr. 149:16–18) (Frank Garza).

[5] A461, A463, A489–90 (Tr. 147:12–16, 149:16–18, 175:20–176:5) (Frank Garza).

[6] A537, A562–64 (Tr. 26:1–12, 51:12–53:5) (Andy Velasquez).

[7] A663 (Tr. 152:1–6) (Ely Ortiz).

[8] A592–93 (Tr. 81:17–82:23) (Ely Ortiz).

the restaurant.[9]  Instead, they rummaged around inside the Ford until one of the men exited from the vehicle and searched the ground briefly.[10]

Ely claimed that he peered through the restaurant's entrance doors to see if the keys were still at their table; they were not there.  He then walked to a nearby convenience store and purchased a soda.[11]  Before entering the store, Ely removed a balaclava mask that he was wearing so that he did not appear suspicious.  The mask belonged to Jose and, when worn, covered Ely's entire face except for his eyes and eyebrows.  When Ely returned to the Ford, Yony called him to say that he was almost there.  Ely then drove the Ford around to the back of the gas station and parked along the side of a used car lot.  Ely knew parking there would make the Ford more difficult to see from the highway.[12]  Shortly thereafter, Yony and Emner pulled into the restaurant's parking lot in a black Kia sports utility vehicle.

At this point, Ely's and the Morales-Garcia brothers' accounts of who went inside the restaurant diverge.  According to Ely, he walked over to the Kia in the restaurant's parking lot.  The Kia was still running.  Yony sat in the front passenger seat, and Emner sat in the backseat.  Ely said that he got into the Kia's driver's seat,

---

[9] A657–59 (Tr. 146:17–148:21) (Ely Ortiz).

[10] State's Ex. 41 (Security Video from used car lot 22:00–24:53).

[11] A664–65 (Tr. 153:2–154:23) (Ely Ortiz); *see also* State's Ex. 39 (Convenience Store Security Video 00:35–02:22) [hereinafter "Convenience Video"].

[12] A674 (Tr. 163:20–22) (Ely Ortiz).

shifted the vehicle into reverse, and maneuvered it to the side of the restaurant. Yony and Emner got out of the Kia and entered the restaurant while Ely waited in the vehicle. Ely claimed to have a view of the restaurant's storefront and watched as Yony and Emner entered. He did not see anyone enter behind them. He could not see inside the restaurant or the Ford parked on the side of the used car lot. Ely claims that he did not witness Yony holding a firearm at any point.[13] Yony tells a different story.

According to Yony, after he parked the Kia in the restaurant's parking lot, Emner told him to wait in the vehicle. Yony turned on the radio and listened to music. As Emner walked towards the restaurant, Ely intercepted him in the parking lot. Ely was apparently angry. Ely asked Emner to go into the restaurant and steal Frank's crucifix pendant and gold chain from around his neck. Ely wanted to steal the items because the people at Frank's table had disrespected him earlier that day. Ely pointed Frank out in the restaurant.

Emner, who admitted he was "a little tipsy," thought it was a "joke."[14] Ely handed Emner a balaclava mask, which Emner wore as he walked into the restaurant. Emner felt someone enter the restaurant behind him, but he did not turn around. That person was masked and pointed a firearm at a waitress.

---

[13] A679 (Tr. 168:10–12) (Ely Ortiz).

[14] A710 (Tr. 199:2–4) (Emner Morales-Garcia).

6

Emner rushed toward Frank's table, reached across it, and yanked a crucifix pendant and gold chain from around Frank's neck. Frank did not see Emner reach across his table because he was talking with someone beside him. Frank yelled instinctively. Armando went after Emner. Emner attempted to run back out of the restaurant's entrance but stumbled and fell to the floor. As he lifted himself up off the floor, he heard a firearm discharge.

Frank screamed for everyone to drop to the floor for cover. The second masked man was still standing at the restaurant's entrance with the firearm. Andy saw the man aim the firearm at Armando and then watched as Armando went limp and fell to the ground. He then witnessed the same fatal sequence happen to Honorio. After Emner and the gunman left the restaurant, Frank rushed over to Armando and Honorio and yelled at the restaurant owner to call 911.

Ely's and the Morales-Garcia brothers' accounts of what occurred following the shooting also differ. According to Ely, Emner and Yony returned to the Kia and told him that there was a problem and that they needed to leave. Ely claimed that he did not hear any gunshots or "anything that surprised [him]" while he waited, despite sitting in the Kia right next to the restaurant.[15] He claimed that the windows were closed and that he was listening to the radio.

---

[15] A606–07 (Tr. 95:22–96:3) (Ely Ortiz).

7

According to the Morales-Garcia brothers, Emner and Ely ran back to the vehicle minutes after Emner had left to search for Ely. They both got into the Kia and told Yony to "drive."[16] Emner sat in the front passenger's seat, and Ely sat in the backseat. Yony described Ely as "acting weird" and "paranoid."[17] No one talked. Emner claimed that he was too scared to turn around to see if Ely was wearing, or holding, a mask.

Delaware State Police ("DSP") dispatched Trooper First Class Kenny Haynes. When he arrived at the scene, Trooper Haynes assessed the condition of the shooting victims. While Trooper Haynes tended to the wounded, Georgetown Police Department Master Corporal Kenneth W. Rogers collected evidence. DSP Detective Daniel Grassi eventually arrived and served as lead investigator. He secured the scene and assigned duties to the other investigators.

In his search for evidence, Trooper Haynes found a brass cartridge casing on the floor of the restaurant, but he did not find a firearm. The search for evidence also included gathering video footage. There were no working cameras inside the restaurant or outside on its premises. However, Detective Grassi was able to recover video footage from a convenience store and liquor store located north of the restaurant. He was also able to recover video footage from the used car lot. The

---

[16] A769 (Tr. 258:14–19) (Yony Morales-Garcia).

[17] A769 (Tr. 258:2–23) (Yony Morales-Garcia).

liquor store footage recorded the Ford parked in front of it before the shooting. Detective Grassi confirmed that Jose owned the Ford. Detective Grassi also confirmed through the convenience store footage that Ely had walked in and purchased a drink. That footage showed Ely meeting with Jose outside as well.[18]

The police also interviewed the restaurant's patrons. Patrons described the masked man who stole Frank's gold chain as having two shaved lines in one of his eyebrows. They also said that the man wore a black jacket, hoodie, and black mask. No one was able to offer a clear description of the gunman. One patron described the gunman as having black hair, and another said he was taller than the other masked man.

The next day, after he heard that both victims had died, Emner buried his clothes and the gold chain in his backyard.[19] Emner then messaged Ely and told him not to tell law enforcement about his involvement in the shooting. This message caused Ely to become concerned. He began to worry that the Morales-Garcia brothers might frame him. To make sure the Morales-Garcia brothers did not "pin" the deaths on him, Ely went to talk to the police.[20]

---

[18] A286–87 (Tr. 83:1–84:23) (Det. Grassi); *see also* Convenience Video 00:35–02:22.

[19] A743 (Tr. 232:16–23) (Emner Morales-Garcia).

[20] A687–88 (Tr. 176:12–177:11) (Ely Ortiz).

9

Ely spoke with Detective Grassi. Based on Ely's account of the evening, Detective Grassi drafted an arrest warrant for Emner and Yony and arrested them.[21] Detective Grassi interviewed Emner after his arrest. Emner told Detective Grassi that he had buried a black duffle bag containing his denim jeans, Timberland boots, and the gold chain in his backyard.[22]

Emner and Yony were indicted jointly on seventeen counts: two counts of first-degree murder, seven counts of possession of a firearm during the commission of a felony, one count of first-degree robbery, three counts of first-degree reckless endangering, one count of aggravated menacing, one count of carrying a concealed deadly weapon, one count of wearing a disguise during the commission of a felony, and one count of first-degree conspiracy.[23]

In January 2023, the court ordered that the Morales-Garcia brothers be tried separately.[24] Emner accepted a plea offer from the State, pleading guilty to first-degree robbery and second-degree conspiracy.[25] Yony's case proceeded to trial in December 2023; however, the court declared a mistrial after the jury deadlocked.[26]

---

[21] *See* A621–22 (Tr. 110:11–111:5) (Ely Ortiz); *see also* A17–24 (Det. Grassi's Arrest Warrant dated Jan. 27, 2022).

[22] A289–A292 (Tr. 86:18–89:18) (Det. Grassi).

[23] A1 (Super. Ct. Dkt. at 1); A25–31 (Indictment by Grand Jury dated Feb. 15, 2022).

[24] A6 (Super. Ct. Dkt. No. 38).

[25] A757–58 (Tr. 246:20–247:22) (Emner Morales-Garcia).

[26] A9–10 (Super. Ct. Dkt. No. 63).

The State retried the case in May 2024.[27]  Following the presiding judge's introductory remarks, the second trial began with the State's opening statement in which the prosecutor told the jury:

> And when [Emner] tripped, the defendant opened fire in the direction toward his brother to protect his brother. *Emner has actually admitted to this crime already and has pled guilty to the robbery of that chain.* He also told Detective Grassi where to find the chain and some of the items of clothing that he was wearing that night. . . .  [Emner] walked up to Frank and ripped the chain, as I said, and as he tripped his brother, the defendant, was nervous that the guys that he just stole from were going to attack him, so he opened fire.[28]

The prosecutor made these statements even though the State did not intend to call Emner as a witness during its case-in-chief.  The State also did not know whether Emner would testify at all because it had not received a defense witness list.[29]

Additionally, during the State's case-in-chief and before Emner testified, the prosecutor elicited the following testimony from Detective Grassi:

| State: | And did you have another opportunity to actually speak with Emner after that night? |
|---|---|
| Grassi: | Yes, on January 30th. |

---

[27] A12 (Super. Ct. Dkt. No. 83).

[28] A210 (Tr. 7:11–23) (emphasis added).

[29] Oral Arg. 27:41–54 (July 9, 2025), *available at*

https://courts.delaware.gov/supreme/oralarguments/  [hereinafter  "July  Oral  Arg."]  (State conceded at oral argument that it did not receive a witness list from the defense).  The State did receive a defense witness list for the first trial.  A91 (Final Case Rev. Tr. 14:1–7) (prosecutor informing the court that she had received a copy of the defense witness list for the first trial).

State: Okay. And has Emner Morales Garcia resolved his charges in this case?

Grassi: Yes.

State: Are you aware of what the result of those -- of that was?

Grassi: He pled guilty with the lead charge being robbery first.

. . .

State: You indicated Mr. Emner Morales Garcia pled to the lead charge of robbery first degree. Are you aware if he pled to any additional charges?

Grassi: He did plead to another charge. I just don't have it in front of me. I don't know what the additional charge was.

State: And --

Grassi: I believe – I'm sorry. I believe it was conspiracy, but again, I don't have the sheet in front of me.

State: Okay. Thank you.[30]

The prosecutor elicited testimony from Detective Grassi that Emner pleaded guilty to "conspiracy" in addition to first-degree robbery. The prosecutor had not mentioned the conspiracy guilty plea in her opening statement.

After Detective Grassi's testimony, Yony's case-in-chief began, and defense counsel called Emner to the stand.[31] During Emner's direct examination, he implied that Ely was the shooter because "Ely was the only other person I spoke to before I went into the restaurant []."[32]

---

[30] A696, A698 (Tr. 185:3–12, 187:3–13) (Det. Grassi).

[31] A706 (Tr. 195:11–13).

[32] A721 (Tr. 210:17–23) (Emner Morales-Garcia).

12

During Emner's cross-examination, the following (abridged) exchange occurred:

State:    You were ultimately arrested on criminal charges, correct?

Emner:    Yes.

State:    And you pled guilty to robbery for stealing Mr. Garza's necklace, correct?

Emner:    I wasn't going to take a plea. You guys had offered manslaughter, robbery, and conspiracy plea. My lawyer came back and he told me that you guys had offered that and that was your last offer. And I told him: Well, you know, I want to go to trial and at least prove my innocence on the part that those two individuals that were shot I had nothing to do with that.

. . .

State:    The question was: You pled guilty to robbery, correct?

. . .

Emner:    Yes, I took the plea because after my lawyer came back with the plea that you guys had offered -- the manslaughter plea -- I told him no. I didn't want to take no plea. I wanted to go to trial. And a couple weeks before the trial, he came back and he told me that you guys offered another plea, which was robbery, and he told me that there was no point in going to trial because, at the end of the trial even if I prove my innocence on the murder charge, I was still going to have to do the time for the robbery charge because I confessed into [sic] taking the chain. So, yes, I did take the robbery charge for that reason.

State:    It was that robbery that you pled to that led to a double murder, correct?

Emner:    Yes.

State:    You also pled guilty to conspiracy in the second degree, correct?

Emner:    Yes.

13

State:     Conspiracy is agreeing to commit a crime with someone else, correct?

Emner:     Well if that's what you call the conversation -- yes, if that's what you call the conversation that me and Ely had, then, yes.[33]

Following Emner's testimony, Yony took the stand. Yony denied that he was the gunman.[34] He also confirmed that Emner pleaded guilty to robbery for stealing Frank's gold chain.[35] The jury convicted Yony on all seventeen counts, including two counts of first-degree murder.[36]

Yony appealed to this Court, raising two claims. He first argues that the prosecutor committed two instances of prosecutorial misconduct that substantially prejudiced his right to a fair trial.[37] The first instance was the prosecutor's remarks in her opening statement that Emner had pleaded guilty to robbery and "admitted to this crime already," both of which she placed between statements claiming that Yony was the shooter. The second instance was during the State's case-in-chief – before Emner testified – when the prosecutor elicited testimony from Detective Grassi that Emner had pleaded guilty to first-degree robbery and "conspiracy." Yony's second contention is that, even if the prosecutor's conduct during trial was proper, it was

---

[33] A756–58 (Tr. 245:3–247:22) (Emner Morales-Garcia).

[34] A773 (Tr. 262:9–21) (Yony Morales-Garcia).

[35] A774 (263:2–4) (Yony Morales-Garcia).

[36] A944–47 (Completed Jury Verdict Sheet).

[37] Opening Br. 38 (Feb. 28, 2025) [hereinafter "Opening Br."].

plain error for the court not to give a limiting instruction *sua sponte*. Yony argues that the instruction would have lessened the resulting prejudice by advising the jury of the limited purpose for which it could consider Emner's guilty plea.

The State counters Yony's appeal with four arguments. First, the State argues that Yony forfeited his right to claim prosecutorial misconduct by not objecting to the State's opening statement or Detective Grassi's testimony about Emner's guilty plea.[38] The State also argues that Yony waived his right to claim misconduct when his trial counsel made a tactical decision not to object to hearsay testimony given by Detective Grassi.[39] Second, the State argues that the references to Emner's guilty plea did not constitute prosecutorial misconduct because the references were not used as substantive evidence to prove Yony was the shooter.[40]

The State's third argument is that, even if prosecutorial misconduct occurred, reversal is unwarranted because the State introduced "overwhelming evidence" of Yony's guilt.[41] The State's fourth and final argument is that the Superior Court's failure to issue a limiting instruction to the jury did not constitute plain error because Yony was not prejudiced by the error.[42]

---

[38] Answering Br. 20–21 (Mar. 31, 2025) [hereinafter "Answering Br."].

[39] *Id.* at 18–21.

[40] *Id.* at 21–23 (quoting *Allen v. State*, 878 A.2d 447, 450 (Del. 2005)).

[41] *Id.* at 24.

[42] *Id.* at 29–30. In July 2025, this Court requested supplemental briefing. *See* Supr. Ct. Letter to counsel dated July 14, 2025. Both parties submitted timely supplemental briefs. In its

15

## STANDARD OF REVIEW

Whether we review a claim of prosecutorial misconduct for plain error or harmless error depends on whether the defendant fairly raised the issue below.[43] Yony did not raise the issue below, so we review for plain error. Recently, in *Suber v. State*, we restated the plain error standard of review. There, we posed four questions that have traditionally formed the plain error standard.[44] We start with two threshold questions.[45] The first question is whether an adequate record exists for this Court to review the issue on appeal.[46] The second question is whether "there [was] an error."[47] That is, we ask whether the party "knowingly and intelligently waived"

---

supplemental brief, the State departed from its argument that the defense calling Emner alleviated any prejudice. *See* Defendant's Suppl. Br. 7 (Aug. 15, 2025), *and* State's Suppl. Br. 5 (Aug. 15, 2025) [hereinafter "State's Suppl. Br."] (agreeing that *Allen* should apply regardless of whether the State or defense calls the co-defendant).

Following the supplemental briefing, this Court held a second oral argument on this appeal in November 2025. At the second oral argument, the State conceded that we should vacate Yony's conviction for first-degree conspiracy. Oral Arg. 22:30–38 (Nov. 5, 2025), *available at* https://courts.delaware.gov/supreme/oralarguments/ [hereinafter "Nov. Oral Arg."]; *see also* A944–47 (Completed Jury Verdict Sheet). The State made this concession because: (1) the jury was not instructed on an element of first-degree conspiracy, and (2) the indictment's seventeenth count, which charged Yony with first-degree conspiracy, was a mistake and should have been second-degree conspiracy. Nov. Oral Arg. 20:05–22, 22:13–38; *see also* A944–47 (Completed Jury Verdict Sheet). Nevertheless, the State remained resolute at oral argument that the prosecutor did not commit misconduct or violate *Allen* and, even if the prosecutor did, her conduct did not constitute plain error.

[43] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).

[44] *Suber v. State*, __A.3d__, 2026 WL 184867, at *5 (Del. Jan. 15, 2026).

[45] *Id.*

[46] *Id.*

[47] *Id.*

16

the right.[48]  The State carries the burden of proving waiver and we make "every reasonable presumption against waiver."[49]

If an adequate record exists and the party did not waive the right, we then proceed to *Suber*'s third question for forfeited errors, which asks whether the error was plain.[50]  An error is plain if it violates "current law."[51]  The state of the current law is determined from the appellate court's point of view when reviewing the trial record, not from the trial court's perspective.[52]

If we find that the error was plain, we proceed to *Suber*'s fourth, and final, question.  That question is "whether the error adversely affect[ed] the substantial rights of the party."[53]  "To affect the substantial rights of a party, the error must 'be so clearly prejudicial as to jeopardize the fairness and integrity of the trial process.'"[54]  An error is clearly prejudicial when there is a "reasonable probability

---

[48] *Id.*

[49] *Id.* (quoting *Flamer v. State*, 490 A.2d 104, 113 (Del. 1983)).

[50] *Id.* at *5 & n.27 ("Waiver is often used to describe forfeiture, but the two are distinct concepts. . . . [W]aiver is the knowing and intelligent waiver of a right.  Forfeiture, on the other hand, 'is the failure to make the timely assertion of a right.'  Waived issues are not reviewed for plain error.  A forfeited error can lead to reversal but is subject to plain-error review." (citation omitted) (quoting *Purnell v. State*, 254 A.3d 1053, 1101 (Del. 2021))).

[51] *Id.* at *5.

[52] *Id.*

[53] *Id.* at *6.

[54] *Id.* (quoting *Johnson v. State*, 813 A.2d 161, 165 (Del. 2001)).

that, but for the error, the outcome of the proceeding would have been different."[55] The defendant bears the burden of proving prejudice under this question.[56] When the error involves jurisdiction or is otherwise a structural constitutional error, we presume this fourth question is satisfied.[57]

## **ANALYSIS**

We apply the *Suber* questions in turn, determining whether: (a) the trial record is adequate; (b) the claims were forfeited or waived; (c) the claimed misconduct violates current law; and (d) there is a reasonable probability that, but for the misconduct, the outcome would have been different.[58]

### *A.     Adequacy of the Record*

The trial record is adequate to review Yony's claims. Both instances of alleged misconduct are contained in the trial transcript. And, unlike *Swanson v. State*, the State was not precluded from creating an evidentiary record in the trial court.[59] In *Swanson*, this Court declined to review a defendant's argument on appeal that the

---

[55] *Id.* (quoting *Greer v. United States*, 593 U.S. 503, 507–08 (2021)) (internal quotation marks omitted).

[56] *Id.* If we find that the misconduct does not warrant reversal under *Suber*, we proceed to a *Hunter v. State* analysis. In *Hunter*, we held that a prosecutor's repeated "improper comments," which we had prohibited in past decisions, required reversal. *Hunter v. State*, 815 A.2d 730, 738 (Del. 2002). The repetitive misconduct must be the "same errors over multiple trials." *Saavedra v. State*, 225 A.3d 364, 383 (Del. 2020). Yony conceded at oral argument that *Hunter* does not apply here. July Oral Arg. 17:49–18:39.

[57] *Suber*, 2026 WL 184867, at *6 & n.32.

[58] *Id.* at *5–6.

[59] *Id.* at *5 (quoting *Swanson v. State*, __A.3d__, 2025 WL 3778943, at *2 (Del. Dec. 31, 2025)).

18

search of his person violated the Fourth Amendment, as he did not move to suppress the evidence before the trial court.[60] There, we warned that it was fundamentally unfair for Swanson to argue for the first time on appeal that the State had insufficient evidence to search him when the State would have introduced evidence to counter the argument at a suppression hearing.[61] Here, the State was not disadvantaged by the lack of a record.

### B. Waiver of Claims

Yony did not waive his right to claim prosecutorial misconduct. The State attempts to cast Yony's failure to object as a tactical decision to avoid emphasizing Emner's guilty plea.[62] The record does not support the State's assumption as to Yony's trial strategy. Due to this lack of support, the State attempts to draw a comparison to a different, express tactical decision made by defense counsel at trial.[63] Following Detective Grassi's hearsay testimony, defense counsel spoke at sidebar with the court:

> Court: [Defense counsel], I want to direct this to you. There's been some hearsay that's been elicited about what Emner Morales-Garcia said. I assume that your failure to object is a tactical decision.

---

[60] *Swanson v. State*, __A.3d__, 2025 WL 3778943, at *2 (Del. Dec. 31, 2025).

[61] *Id.* at *3.

[62] Answering Br. 20.

[63] *Id.* at 18–21.

19

Defense:    I have him listed as a witness. I plan on calling him as a witness.

Court:    All right. Very good.[64]

Counsel's apparent agreement that he made a tactical decision not to object concerned Emner's statement about where he had hidden the duffle bag and had no relation to the prosecutor's opening remarks or the testimony elicited about Emner's guilty plea. As Yony correctly notes, defense counsel's "tactical decision not to object to a certain portion of testimony does not mean that he made a tactical decision not to object to other portions of it."[65] Because Yony did not waive his claims, we consider the error forfeited—he failed to make a timely assertion of his right—and we proceed to *Suber*'s third question and consider whether the error was plain.[66]

## C. *Prosecutorial Misconduct*

We find that the prosecutor's remarks during the State's opening statement and her eliciting testimony about Emner's guilty plea are both plain errors under *Allen v. State*. In *Allen*, the defendant and his co-defendants, Isaiah Howard and Kevin McCray, were indicted on twenty charges arising from three different burglaries.[67] Before trial, Howard and McCray pleaded guilty to lesser charges.[68]

---

[64] A293 (Tr. 90:4–11).

[65] Reply Br. 4 (Apr. 15, 2025).

[66] *Suber*, 2026 WL 184867, at \*5 & n.27.

[67] *Allen v. State*, 878 A.2d 447, 449 (Del. 2005).

[68] *Id.*

20

At trial, Howard testified for the prosecution about his plea agreement.[69] McCray did not testify.[70] Following Howard's testimony, the prosecutor did not introduce Howard's written plea agreement into evidence.[71] Instead, the prosecutor moved to introduce McCray's plea agreement.[72] The defendant objected and argued that the State was using McCray's guilty plea agreement to improperly bolster Howard's testimony.[73]

This Court held in *Allen* that a co-defendant's written plea agreement—like a co-defendant's conviction—is not generally admissible in a defendant's trial.[74] Specifically, we held that a "co-defendant's plea agreement may not be used as substantive evidence of a defendant's guilt, to bolster the testimony of a co-defendant, or to directly or indirectly vouch for the veracity of another co-defendant who pled guilty and then testified against his or her fellow accused."[75] We permitted a co-defendant's guilty plea to be introduced into evidence for three limited purposes: "allowing the jury to accurately assess the credibility of the co-defendant witness, to address the jury's possible concern of selective prosecution[,] or to

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 450.

[75] *Id.*

explain how the co-defendant witness has first-hand knowledge of the events about which he or she is testifying."[76] The foundational principle underlying *Allen* is the

> right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else. The defendant has a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else.[77]

Although this matter does not concern the introduction of a written plea agreement into evidence, the same foundational principle applies. The State's verbal reference to a co-defendant's guilty plea introduces the same prejudicial information to the jury that, as in *Allen*, risks the jury convicting a defendant based on a co-defendant's admission of guilt rather than on the evidence of the defendant's guilt.

The prosecutor's intentional admission of inadmissible evidence violated prosecutorial standards.[78] When assessing the propriety of a prosecutor's trial tactics, we have been guided by American Bar Association standards.[79] We previously adopted a portion of Standard 3–6.6 ("Presentation of Evidence"), which

---

[76] *Id.* at 450–51.

[77] *United States v. Gambino*, 926 F.2d 1355, 1363 (3d Cir. 1991) (quoting *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 312 (3d Cir. 1980)) (citation modified).

[78] *Allen*, 878 A.2d at 450.

[79] *Watson v. State*, 303 A.3d 37, 44–45 (Del. 2023); *see also Bunting v. State*, 907 A.2d 145, 2006 WL 2587074, at *3 (Del. Sep. 7, 2006) (TABLE) ("We have not stated an all-inclusive definition of prosecutorial misconduct."); *Reyes v. State*, 315 A.3d 475, 489 (Del. 2024) (characterizing the prosecutorial standards and our precedent as "guideposts").

precludes a prosecutor from highlighting inadmissible matters for the fact finder.[80]

We now adopt a relevant portion of Standard 3–6.5 ("Opening Statement at Trial"), which restricts what the State may reference in its opening statement.[81]

We address each instance of misconduct separately below.

### 1. The Opening Statement

We hold that the State's remarks in its opening statement amounted to prosecutorial misconduct.[82] The State knew, or should have known, that it was impermissible to inform the jury that Emner "admitted to this crime already and has pled guilty to the robbery of that chain" between two statements that Yony fired a firearm to protect Emner.[83] Indeed, at oral argument in this Court, the State

---

[80] *Watson*, 303 A.3d at 44–45 ("The prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments. . . ." (citation omitted)).

[81] Crim. Justice Standards for the Prosecution Function Standard 3–6.5(b), Am. Bar Ass'n (2017), *available at* https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/ [hereinafter "Standard"] ("The prosecutor's opening statement at trial should be confined to a fair statement of the case from the prosecutor's perspective, and discussion of evidence that the prosecutor reasonably believes will be available, offered and admitted to support the prosecution case. The prosecutor's opening should avoid speculating about what defenses might be raised by the defense unless the prosecutor knows they will be raised.").

[82] Because prosecutorial misconduct can occur absent intent or malice, this finding is not meant as a statement on the prosecutor's culpability. *See, e.g.*, *Trala v. State*, 244 A.3d 989, 1000 (Del. 2020) ("The prosecutor has a duty to take care that the argument the State presents to the jury stands or falls on its own merit, rather than relying, *even unintentionally*, on the respect and deference to which the public gives the prosecutor's office." (emphasis added)); *Flemming v. Warden*, 2012 WL 3693859, at *33 (E.D. Cal. Aug. 24, 2012) ("Prosecutorial misconduct does not require a showing of bad faith or wrongful intent.").

[83] A210 (Tr. 7:11–23) (emphasis added).

23

acknowledged that these remarks were an "unfortunate decision" that "should not have happened."[84]  The remarks violated our decision in *Allen v. State*, as well as prosecutorial standards.[85]

In our view, the prosecutor's reference to Emner's guilty plea in her opening statement served to suggest that the jury infer that Yony was guilty because Emner was guilty.  As in *Allen*, we therefore "have no basis to conclude" that the jury did not use Emner's guilty plea as substantive evidence of Yony's guilt.[86]

The State argues that this Court has previously held that a prosecutor's "negligible reference" to a co-defendant's case outcome was not prosecutorial misconduct.[87]  This is true.  However, the cases cited by the State, *Dillard v. State* and *Wheatley v. State*, are both factually distinguishable.  In *Dillard*, the prosecutor told the jury: "You saw and heard some things about other defendants.  Those other defendants have resolved their cases.  The case today is only about Mr. Dillard and his actions during this case and how he is involved."[88]  In *Wheatley*, the prosecutor informed the jury "that the defendant had an altercation with a co-defendant tried

---

[84] July Oral Arg. 21:20–40.

[85] *Allen*, 878 A.2d at 450.

[86] *Id.* at 451.

[87] State's Suppl. Br. 18.

[88] *Dillard v. State*, 337 A.3d 1267, 2024 WL 5165709, at *3 (Del. Dec. 19, 2024) (TABLE).

separately."[89] These statements do not explicitly refer to a co-defendant's guilty plea or implicate any underlying facts. Here, the prosecutor not only stated that Emner pleaded guilty to a specific crime but also claimed that Emner "admitted to this crime" amidst two statements asserting that Yony was the shooter and was acting to protect Emner. These tactics created an additional inference of guilt by association that is not present in the more general statements found in *Dillard* and *Wheatley*.

The prosecutor's remarks in the State's opening statement violated prosecutorial standards.[90] The remarks were impermissible because they violated Standard 3–6.5(b).[91] Under this standard, the State cannot refer to evidence in its opening statement unless it "reasonably believes" the evidence will be "available, offered, or admitted to support" its case.[92] The State could not have reasonably believed that the evidence would support its remarks because the State did not intend to call Emner as a witness. In its answering brief, the State argues that the prosecutor knew that the defense "would call him as a witness."[93] But, as the State conceded at oral argument, the prosecutor had not received a defense witness list before trial.[94]

---

[89] *Wheatley v. State*, 465 A.2d 1110, 1113 (Del. 1983).

[90] *Allen*, 878 A.2d at 450.

[91] Standard 3–6.5(b).

[92] *Id.*

[93] Answering Br. 23.

[94] *Compare Id.* (arguing that the prosecutor knew the defense would call Emner to testify), *with* July Oral Arg. 27:41–54 (conceding at oral argument that it did not receive a witness list from the defense).

25

The State was merely speculating about Yony's defense strategy instead of attempting to "avoid speculating about what defenses might be raised by the defense."[95]  Although Emner testified at Yony's first trial, Yony had the right to alter, or even abandon, the strategy deployed in his first trial.  Yony could call different witnesses or choose not to call any witnesses.  In other words, as the State conceded at oral argument, the prosecutor did not "know" Emner would testify when she made these remarks.[96]

### 2.  Testimony Concerning Emner's Guilt

In the State's case-in-chief – before Emner testified – the prosecutor re-called Detective Grassi to the stand, and he testified that Emner pleaded guilty to first-degree robbery and "conspiracy."[97]  Eliciting this testimony was impermissible because it violated *Allen*, as well as prosecutorial standards.

We again see no purpose for eliciting such testimony except as substantive evidence of Yony's guilt.[98]  The State claims that Detective Grassi's testimony was elicited to

> impeach [Emner's] claim during direct testimony that he did not conspire with anyone, and [] to show (in conjunction with Ely Oritz Perez's testimony as well [as] other witnesses' testimony who were in

---

[95] Standard 3–6.5(b).

[96] *Id.*; July Oral Arg. 27:28–55.

[97] A696, A698 (Tr. 185:3–12, 187:3–13) (Det. Grassi).

[98] *Allen*, 878 A.2d at 450.

the restaurant) that Emner Morales-Garcia planned the robbery with another person and that the most likely person with whom Emner would have conspired to commit the robbery *and murders* was his brother, Yony Morales-Garcia.[99]

Both arguments fail. The first argument is based on *Allen*'s limited purpose exception of "allowing the jury to accurately assess the credibility of the co-defendant witness."[100] However, Detective Grassi testified that Emner pleaded guilty to robbery and conspiracy *before* Emner testified.[101] The State cannot impeach Emner's testimony before it has occurred.[102] In the second argument, the State concedes that it used Detective Grassi's testimony to show that Yony conspired with Emner not only to commit the robbery, but also the murders.[103] The State therefore used a co-defendant's guilty plea as substantive evidence of a defendant's guilt.[104] This was not permissible.

---

[99] State's Suppl. Br. 9 (emphasis added).

[100] *Allen*, 878 A.2d at 450–51.

[101] *Compare* A692 (Tr. 181:11) (Det. Grassi), *with* A706 (Tr. 195:17) (Emner Morales-Garcia).

[102] *See Getz v. State*, 538 A.2d 726, 731–32 (Del. 1988) ("[T]he State presented the other sexual misconduct evidence in its case-in-chief and must justify its use *at that time* and not on the basis of whether the defendant might later offer evidence of his own character." (emphasis added)).

[103] State's Suppl. Br. 9 ("The State used Emner Morales-Garcia's conspiracy guilty plea . . . to show (in conjunction with Ely Oritz Perez's testimony as well [as] other witnesses' testimony who were in the restaurant) that Emner Morales-Garcia planned the robbery with another person and that the most likely person with whom Emner would have conspired to commit the robbery and murders was his brother, Yony Morales-Garcia.").

[104] *Allen*, 878 A.2d at 451.

At oral argument before this Court, the State asserted that it was permissible, under *Allen*, for the prosecution to use the "facts underlying the guilty plea to show that it was Yony Morales-Garcia who was in fact the other person who went into the restaurant and committed the crimes."[105] There is one major flaw in this argument. The facts underlying Emner's guilty plea to first-degree robbery and second-degree conspiracy are that Emner stole Frank's gold chain and conspired with another person to commit robbery. The underlying facts do not implicate Yony as the gunman. The State repeatedly asserted at oral argument, without further explanation, that the prosecutor's reliance on the underlying facts of Emner's guilty plea was "different" from using that guilty plea as evidence of Yony's guilt.[106] Under these circumstances, we are not persuaded that there is a difference.

Moreover, eliciting Detective Grassi's testimony violated prosecutorial standards. The State's conduct violated Standard 3–6.6(d), which prevents a prosecutor from "bring[ing] to the attention of the trier of fact matters that the prosecutor knows to be inadmissible."[107] The State knew, or should have known, that eliciting such testimony from Detective Grassi before Emner testified was inadmissible. The prosecutor's decision to elicit this testimony before cross-

---

[105] *See* July Oral Arg. 25:18–31.

[106] *See* July Oral Arg. 25:30–27:00.

[107] Standard 3–6.6(d); *see also Watson*, 303 A.3d at 44.

28

examining Emner shows that the prosecutor was not introducing this fact for a proper purpose under *Allen*. That is, instead of impeaching Emner when he testified, the prosecutor chose to introduce testimony to imply Yony's guilt.

    D.    *Reasonable Probability of a Different Outcome*

Having found that plain error occurred—in the form of prosecutorial misconduct—our last step is to determine whether there is a reasonable probability that, but for this misconduct, the jury's verdict would have been different. Regardless of whether we view the instances of misconduct separately or together, we hold that there was a reasonable probability of a different verdict.

The central issue of this case was the gunman's identity. As we noted in *Suber*, we do not approach "violations lightly when the State relies on the improperly admitted evidence to identify the perpetrator of a murder."[108] Contrary to the State's claim that the evidence of Yony's guilt was "overwhelming," an assertion the State retreated from at oral argument, Yony's first trial ended in a deadlocked jury.[109] Law enforcement found no direct evidence linking Yony to the shooting. There were no eyewitness accounts identifying Yony, no firearm was found that was linked to Yony,

---

[108] *Suber,* 2026 WL 184867, at *7.

[109] *See* July Oral Arg. 33:50–34:54 (when asked by the Court to clarify how the evidence against Yony was "overwhelming," the State withdrew the assertion and apologized"); Answering Br. 24; A9–10 (Super. Ct. Dkt. No. 63 ("Mistrial due to hung jury.")).

and Yony's hands (and Emner's hands) were not tested for gunshot residue.[110] And even Ely testified that he did not see Yony with a firearm.[111]

The trial's outcome rested almost entirely on whether the jury believed Ely or Emner. It was a close question. Sufficient cumulative evidence existed in the record for a jury to believe Emner's narrative. Either instance of misconduct could have carried decisive weight with a juror and improperly influenced deliberations.

Further, when the instances of misconduct are viewed collectively, the effect of both instances clearly prejudiced Yony's substantial rights because the prosecutor's remarks in her opening statement compounded the effect of Detective Grassi's testimony about Emner's guilty plea. Yony has therefore met his burden of showing that there is a reasonable probability that the outcome of his trial would have been different if the misconduct had not occurred.[112]

---

[110] A288, A294–99 (Tr. 85:10–18, 91:14–96:21) (Det. Grassi).

[111] A679 (Tr. 168:10–12) (Yony Morales-Garcia). A firearm matching the brass cartridge was found nearly a month after the shooting, during a routine traffic stop, in the pocket of an individual who had no connection to the restaurant, Yony, Emner, Jose, or Ely. A294–99 (Tr. 91:14–96:21) (Det. Grassi).

[112] Because Yony's first argument is dispositive of this appeal, we do not address his second, alternative argument, which requires this Court find that the evidence of Emner's plea was admitted for a proper, limited purpose under *Allen*. *Purnell v. State*, 106 A.3d 337, 350–51 (Del. 2014) (quoting *Allen*, 878 A.2d at 451). For the same reason, we do not consider the State's waiver argument that it raised for the first time at oral argument. Specifically, the State asserted that Yony waived this alternative argument by not agreeing to include an inapplicable jury instruction in the court's charge. *See* July Oral Arg. 34:55–37:25; *accord* State's Suppl. Br. 6–8. To the extent the State intended this waiver argument to apply to Yony's claims of prosecutorial misconduct, its argument lacks adequate development and therefore is deemed waived.

## CONCLUSION

For these reasons, we **REVERSE** Yony Morales-Garcia's convictions and **REMAND** for a new trial.